1  Jill L. Ryther  SBN 266016
2  Jessica L. Cohen  SBN 274256
   LAW OFFICES OF JILL L. RYTHER
3  6911 Topanga Canyon Blvd., Suite #300
4  Canoga Park, CA 91303
5  Ph: 818-347-4127 Fx: 818-347-4128

6  *Attorneys for Plaintiff,*
7  PETER YOUNG

8              UNITED STATES DISTRICT COURT
9        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION
10

11 PETER YOUNG, an individual.          )
12                                       ) Case No. **CV11-01985 DMG (SHx)**
                                         )
13                    Plaintiff,         ) *Assigned to the Honorable Dolly M.*
14           vs.                         ) *Gee*
                                         )
15                                       )
                                         )
16 Hanna Israel, an individual; Laura    )
17 Lungarelli, an individual; Adam       ) **DECLARATION OF PETER**
   Weissman, an individual; and DOES 1-  ) **YOUNG IN SUPPORT OF HIS**
18 50, Inclusive.                        ) **OPPOSITION TO DEFENDANTS'**
                                         ) **SPECIAL MOTION TO STRIKE.**
19                                       )
20                    Defendants.        )
21                                       )
22                                       )
23                                       )
24                                       )
25 _____ )

26
   I, PETER YOUNG declare:
27
      1. I am the plaintiff in the above-entitled action. I make this declaration in
28

                                        1
_____
                        DECLARATION OF PETER YOUNG

support of my OPPOSITION TO DEFENDANTS' HANNA ISRAEL AND LAURA LUNGARELLI'S SPECIAL MOTION TO STRIKE. The facts set forth herein are true of my own personal knowledge, and if called upon to testify thereto, I could and would competently do so under oath.

2. In February, 2008 I met defendant HANNA ISRAEL ("Israel") when she attended a talk at a community center in Santa Cruz.

3. From on or around June 16, 2009 to on or around August 26, 2009, I traveled on a cross-country road trip with Israel to assist a friend in collecting footage for a documentary film.

4. I invited Israel on the trip for the express purpose of driving, operating the camera, and navigating on long drives.

5. Starting early in the trip, Israel refused to operate the camera, and said that she would not drive. This created conflict from the beginning.

6. On or around July 25, 2009 we took a short break from the trip in Seattle. I told Israel that if she didn't feel she could perform the duties for which she was brought on the trip, it would be best if she left so that I could find someone else to perform these duties. She pleaded to be allowed to stay on the trip, and said she would start performing the tasks for which she'd been invited.

7. Shortly after resuming the trip it was immediately apparent that Israel was continuing her unwillingness to film, navigate, or drive. I told her things were not working out and made repeated requests that she allow me to drop her off at a bus station or airport so she could return home. In every instance she pleaded to remain on the trip.

8. On or around July, 2009 outside Pullman, Washington, Israel told me that she was feeling ill. When we arrived at a filming location I asked if she

2

**DECLARATION OF PETER YOUNG**

wanted to stay in the car. She told me that she wished to come with me.

9. Israel willingly walked a short distance to the filming site without my coercion.

10. At no point during the trip did I force Israel to walk anywhere.

11. At no point during the trip did I physically assault Israel.

12. At no point during the trip did Israel ask to be taken to the hospital.

13. During the trip Israel regularly boasted about having a wealthy father who gave her a lot of money. She stated that her father had given her checks in various five-figure amounts.

14. Two days prior to the trip, in a Gmail G-Chat conversation, Israel told me she had money to live on, and referred to this money as her "safety net." A true and correct copy of the G-Chat conversation between myself and Israel is attached hereto as EXHIBIT A.

15. In order to help fund the trip, I was provided some money by a filmmaker and a magazine editor. The money I was given allowed for approximately $10 per day for food expenses. Israel was not given any funding by the trip's benefactors and I never promised Israel any funding for the trip.

16. During the trip Israel repeatedly told me that she would contribute funds to the road trip to keep the filming project afloat.

17. Early in the trip, I began volunteering to share my food stipend with Israel, allowing each of us $5 per day for food. However, we routinely each spent more than $5 per day. I paid for my additional food out of my own pocket. I routinely observed Israel pay for additional food out of her own pocket.

18. Israel and I also had additional food in the trunk of our car at all times during the trip.

19. At one point during the trip Israel and I had an argument about the funding

DECLARATION OF PETER YOUNG

of the trip. We ran out of cash in Des Moines, Iowa on or around August, 2009. I asked Israel to make a temporary loan to our trip fund and drove to her bank branch. She informed me that even though she had money, she thought that it was my responsibility to pay for the trip and refused to withdraw any funds.

20. Shortly after our disagreement, in a hotel room in Des Moines, Iowa I asked Israel to buy a plane ticket home because I thought that would be the best thing for both of us. Israel purchased a plane ticket but asked to remain on the trip.

21. At no point during the trip did Israel ever ask to leave the trip.

22. On the contrary, I repeatedly suggested that Israel should buy a plane ticket home and Israel repeatedly asked to remain on the trip.

23. On or about August 26, 2009 Israel became enraged over a comment I made about her outfit. Israel threw car keys at me and threw personal objects out of the car. I told her it was no longer healthy or safe for us to remain on the trip together, and took her to the Minneapolis Airport.

24. At no point during the trip did Israel ever inform me that she did not have money to return home from the trip. By contrast, Israel repeatedly had boasted about how much money she had been given by her father. I also observed Israel purchase dinner at a restaurant with her own money on the last day of the trip.

25. After the trip, I learned that Israel and defendants Laura Lungarelli ("Lungarelli") and Adam Weissman ("Weissman") had started making and disseminating false statements about me, my relationship with Israel, and my relationships with women in general. I learned about many of the statements through my own online research. I was also contacted my many friends who

4

told me that they had heard the accusations made about me.

26. On or around August, 2010 after running a Google search of my own name, I visited a website for a group called "Accountability Now." The address of the website was http://wetlands-preserve.org/pipermail/accountabilitynow_wetlands-preserve.org. The website had no graphics but it did contain a long thread of hundreds of emails, many of which contained accusations about me.

27. One email I viewed on the Accountability Now website was sent from Israel's email address, distortionxplease@gmail.com, which I was familiar with due to my own correspondence with Israel. Israel's email stated that "A number of women you were intimate with experienced verbal, emotional, or sexual abuse from you in the past several years. More specifically, these experiences included coercion and sexual assault by forcing your former partner to engage in unwanted sexual activity." This email was posted on a publicly available website. A true and correct copy of the email is attached hereto as EXHIBIT B.

28. The Accountability Now website also contained emails written by Lungarelli. I am personally familiar with Lungarelli, who I met when she was Israel's roommate.

29. In one email, Lungarelli appeared to be in contact with a "collective" in Philadelphia who were going to show a film I was in, but had heard that I was a "rapist" and wanted to know if they should talk about my "abuse" before or after the film. A true and correct copy of the email is attached hereto as EXHIBIT C.

30. Another email sent by Lungarelli to a woman named Camille stated that I am a liar and that Lungarelli is working with "survivors" who had negative

experiences with me. Lungarelli informs Camille that the "survivors" felt "pain and personal strikes" and that, "There are still many womyn who have been affected by Peter that are afraid to come forward." A true and correct copy of this email is attached hereto as EXHIBIT D.

31. Aside from the Accountability Now website, I viewed another email sent by Israel that was posted to an email list, of which I am a member. The email contained a number of accusations about me including the statements that, "Peter subjected me to emotional abuse, threatened me with abandonment, and put my sexual health and legal safety at risk." A true and correct copy of the email is attached hereto as EXHIBIT E.

32. In addition to reading the accusations about me online, I was literally handed a document containing some disturbing accusations about me in person.

33. On or around July 19, 2010 I was attending the Animal Rights 2010 Conference. After being alerted by a friend that someone was passing out flyers about me, I was handed a copy of the flyer in the lobby of the building where the conference was being held. I later identified the man who handed me the flyer as Adam Weissman. The flyer read "Community Alert" above my photo. The text of the flyer stated among other things, that, "There are reports from multiple people that Peter Young has sexually assaulted women and engaged in coercion, manipulation, and emotional abuse. A true and correct copy of the flyer is attached hereto as EXHIBIT F.

34. When I asked Adam Weissman about the flyer, Weissman told me he was passing out the flyers at Israel's request. Later that same day, Weissman told me that Israel wanted me to be held publicly accountable for her allegations. Weissman also told me that Lungarelli had told him she knew multiple women I had raped. Weissman told me if I didn't agree to a

6

DECLARATION OF PETER YOUNG

"public accountability process" which would include publicly declaring myself a rapist, these types of public image attacks would continue at Israel's request.

35. Not only did Weissman inform me that the flyer was distributed at Israel's request, but I viewed an email written by Israel on the Accountability Now website in which Israel refers to the accusations on the flyer as "my accusations." A true and correct copy of the email is attached hereto as EXHIBIT G.

36. It quickly became apparent to me that the accusations Israel, Lungarelli, and Weissman were circulating about me were becoming widespread.

37. On or around November, 2010 I visited a Wikipedia page about me. The page used the same language that was on the flyer containing Israel's accusations and stated that I had been accused of sexually assaulting women. A true and correct copy of the Wikipedia page is attached hereto as EXHIBIT H.

38. On or around late-December, 2010 I viewed a You Tube video that had been posted, accusing me of sexual assault. The video contained an image of the flyer with Israel's accusations that Weissman had previously handed to me.

39. On or around January, 2011 I visited a website at http://activistabuse.wordpress.com. The website began by stating, "There are reports from multiple people that animal rights activist Peter Young engaged in coercion, manipulation and emotional abuse of women." The website contained my picture, and quotes including: "Young's behavior should not be tolerated," "We are providing information about Young's abuse to protect other Womyn. To make sure he never abuses other Womyn again.", "Young is a serial abuser of Womyn", among many other accusations. The website

7

DECLARATION OF PETER YOUNG

1. also contained an image of the flyer that Weissman had previously handed to me. I was the sole subject of the website. I made a copy of all the text on the website to preserve as evidence in the event the website was removed. A true and correct copy of the text of the website is attached hereto as EXHIBIT I.

40. I was disturbed by the prevalence of the accusations detailed above because they are false.

41. I have never sexually abused or raped a woman.

42. I have never physically attacked or assaulted a woman.

43. I have never otherwise abused a woman.

44. I have never starved a woman.

45. I was also surprised by the accusations against me because I knew that Israel knew the accusations were false.

46. During the time the accusations were circulating, Israel and I spoke regularly via the phone, text message, and email. Israel told me she was still in love with me and that she wanted to see me again.

47. On or around October, 2009, I visited Los Angeles and saw Israel for the first time since our trip. She stated she had told numerous people in Los Angeles I was abusive and dangerous. She apologized for spreading false rumors about me and said she was hurt by me breaking up with her. Israel and I slept in the same bed together and engaged in sexual intercourse for two nights while I was in Los Angeles.

48. On or about October, 2009, I confronted Israel again via email about the false rumors she had admitted to spreading.

49. On October 12, 2009 Israel sent me a PGP encrypted email which was sent directly from Israel's personal email address, distortionxplease@gmail.com.

8

DECLARATION OF PETER YOUNG

In the email Israel admitted that I had never sexually abused her, stating, "No Peter, you weren't sexually improper by forcing me to do something I didn't want to do, you didn't rape me, but the degree of degradation you made me feel as the trip went on made me question the value of those acts to you". A true and correct copy of the email is attached hereto as EXHIBIT J.

50. On or about October, 2009, Israel proposed flying to Salt Lake City to see me. After I told her I did not want to see her Israel told me she intended to make sure I was "kicked out" of my social and non-profit work circles. Israel frequently boasted about people she had turned against me through her false statements.

51. In December, 2009 I met with Israel to discuss the false allegations she was making about me. We participated in a mediation with a third party, which lasted several hours.

52. During the mediation Israel stated that she was working on another statement about me containing abuse allegations, which she was going to have published on the internet. Israel also admitted to having money and having food in the car the entire time she told people I had starved her.

53. During the mediation Israel stated that I never did anything sexually inappropriate to her and promised to contact every person she lied to and confess that she had lied. However, given that many of the false statements about me were still circulating after the mediation, I realized that Israel did not confess that she had lied like she promised to do.

54. I have suffered a number of consequences due to the false accusations that have been circulating about me. These false statements began to affect me personally and monetarily. The number of speaking invitations extended to me has decreased by approximately 95 percent. In June 2010, I was

9

physically attacked by two people in an alley in Los Angeles. I recognized both as being friends of Israel. As they attacked me, one screamed to onlookers that I was being attacked because I had sexually assaulted his 19 year old friend. I began to fear for my life everywhere I went.

55. My emotional health worsened as a result of false statements being spread to friends and colleagues across the country. I am frequently confronted and called a rapist and abuser. My romantic life has suffered because women in my personal and professional circle have been told I am a rapist. I have lost many friends. I am deeply depressed and my reputation has been destroyed.

Dated: May 29th, 2011

*[signature]*

PETER YOUNG