1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

PETER YOUNG,

                Plaintiff,

        v.

HANNAH ISRAEL, et al.,

                Defendants.

)
)
)
)
)
)
)
)
)
)

Case No. CV 11-01985 DMG (SHx)

**ORDER RE DEFENDANTS' SPECIAL MOTION TO STRIKE COMPLAINT AS A "SLAPP" SUIT**

    This matter is before the Court on the Special Motion to Strike the Complaint filed by Defendants Hanna Israel and Laura Lungarelli [Doc. # 17].  The Court held a hearing on June 20, 2011.  Having duly considered the parties' positions, as presented in their briefs and at oral argument, the Court now renders its decision.  For the reasons set forth below, Defendants' Motion to Strike is GRANTED in part and DENIED in part.

## I.

## PROCEDURAL HISTORY

    On March 8, 2011, Plaintiff Peter Young filed a complaint against Defendants Hanna Israel, Faith Gundran,[1] Laura Lungarelli, and Adam Weissman for defamation,

---

[1] On May 16, 2011, pursuant to the parties' stipulation, the Court dismissed Defendant Gundran from the action [Doc. #s 19, 21].

false light, and intentional infliction of emotional distress [Doc. #1].  On April 21, 2011, Israel filed a counterclaim against Young for intentional infliction of emotional distress, negligent infliction of emotional distress, and assault [Doc. # 14].

On May 10, 2011 Defendants Israel and Lungarelli filed a special motion to strike the complaint as a strategic litigation against public participation ("SLAPP") suit.  Young filed his opposition on May 31, 2011 and Defendants filed their reply on June 6, 2011.

## II.
## STATEMENT OF FACTS

### A.    Undisputed Factual Background

In 1997, Young set free a number of mink from farms in Wisconsin, South Dakota, and Iowa.  (Israel Decl. ¶ 4(c), Ex. C, filed May 10, 2011.)  In 2005, Young was arrested for and pleaded guilty to charges arising from these acts.  (*Id.*)  Young received a two-year prison sentence and, following his release in 2007, became an active leader in the animal rights movement.  (*Id.*)  Young has written a book about animal activism and given speeches and interviews about his experience as an activist.  (*Id.*)  He acted in a movie about animal liberators and helped release a vegan straight-edge hip hop compilation.  (*Id.* at ¶ 4(a), Exs. A-C.)  Young also has been featured in at least two newspaper articles:  a "wide-ranging" interview about himself in the *Santa Cruz Sentinel* and a feature describing his personal history and role in the animal rights movement in *The Mercury News*.  (*Id.* at ¶ 4(c), Ex. C.)  Young has been invited to gives speeches at various universities and other public forums.  (*Id.* at ¶ 4(d).)

Young and Israel met in or around February 2008 at an event in Santa Cruz where Young gave a speech about his work in the animal rights movement.  (*Id.* at ¶ 2; Young Decl. ¶ 2.)[2]   The two began an intimate physical relationship shortly after they met.  (Israel Decl. ¶ 3, May 10, 2011.)  They began dating in or around early 2009.  (*Id.*)

---

[2] "Young Decl." refers to the Declaration of Peter Young filed on June 21, 2011 [Doc. # 42], as Young's earlier declarations were not signed with the proper affirmation and are thus inadmissible.  *See* 28 U.S.C. § 1746.

Israel accepted Young's invitation to join him on a multi-state road trip to help one of Young's friends shoot and collect footage for an animal rights documentary entitled *Skin Trade*.  (*Id.* at ¶ 6; Young Decl. ¶ 3.)  The road trip lasted from approximately June 16, 2009 until August 26, 2009.  (Israel Decl. ¶¶ 6-9, May 10, 2011; Young Decl. ¶ 3.)

The parties disagree about the details of the events that occurred on that ill-fated road trip, which gave rise to the instant action.

**B.**   **Factual Allegations Regarding the 2009 Road Trip**

**1.**   **Allegations of Physical and Emotional Abuse**

Israel claims that Young was physically, emotionally, and sexually abusive towards her during the road trip.  (Israel Decl. ¶¶ 7-15, May 10, 2011.)  She alleges that, over the course of the trip, Young alternately yelled at her, insulted her, or completely ignored her; sometimes he yelled at her until she cried and continued to yell at her thereafter.  (*Id.* at ¶ 7.)  Young allegedly told her that she was "worthless, selfish, and . . . ruining our work," that she was "f***ing everything up . . . a f***ing brat, a f***ing bitch, and a slut," and that she only cared about herself "and not the animal rights movement."  (*Id.*)  Israel avers that Young was physically aggressive towards her:  while yelling at her, he slammed car and hotel doors, threw objects, and "slammed his fists into objects."  (*Id.*)  Young allegedly threatened on multiple occasions to abandon Israel in unfamiliar places, on one occasion attempting to physically force her out of the car.  (*Id.* at ¶ 8.)  Young threatened to leave Israel at a bus station, causing her to take the car keys and hide in a local library while waiting for Young to calm down.  (*Id.*)

Following the road trip, Young admitted that he had been emotionally abusive. (Israel Decl. ¶ 9, filed June 6, 2011.)  In a text message exchange between the two, Israel stated:  "There was an agreement established before I saw you.  It was broken.  You need to bring to light the fact that you were emotionally abusive.  No 'Jerk in the car.'"  (Israel Decl. ¶ 9, Ex. B, June 6, 2011.)  Young responded, "Yes I was."  (*Id.*)

In her declaration, Danielle Gresham states that she was formerly an activist involved in the animal rights movement, was friends with Israel, and witnessed her

interactions with Young "on multiple occasions throughout the summer of 2009." (Gresham Decl. ¶ 3, June 6, 2011.)  Gresham  heard Young make the following statements to Israel in front of other people:  "You are a spoiled brat," "you are fat," and "you are so stupid.  (*Id.* at *¶ 14.*)  Gresham further avers that Young was generally "disrespectful, rude, and belittling" when speaking with Israel.  (*Id.* at ¶ 5.)  She observed Young "ignore [Israel] as if she was not ever there" when she attempted to speak with him.  (*Id.* at ¶ 6.)

Young denies that he has ever sexually abused, physically attacked, or otherwise abused a woman.  (Young Decl. ¶¶ 41-43.)  Young states that he invited Israel on the trip for the express purpose of helping him with the documentary by driving the car and operating the camera, and that she created conflict by refusing to do so.  (*Id.* at ¶¶ 4-5.)  Young told Israel that she should leave the trip if she was unwilling to perform her duties; he asserts that they resumed the trip only after she promised to comply.  (*Id.* at ¶ 6.)  Israel continued, however, to be unwilling to drive, navigate, or film after they resumed their trip.  (*Id.* at ¶ 7.)  Young then requested that Israel let him drop her off at a bus station or airport to return home, but she requested to stay each time.  (*Id.*)

Israel alleges that she was physically assaulted by Young when he threw objects at her in a hotel room.  (Israel Decl. ¶ 12, May 10, 2011.)  Young demanded that she withdraw money from her bank account to pay for their trip, and when she refused, he took her credit card from her, shook it in her face, and yelled at her.  (*Id.* at ¶ 13.)

Young responds that in or around August 2009, he asked Israel to make a temporary loan to fund the trip after they ran out of cash.  (Young Decl. ¶ 19.)  Israel refused, stating that, while she had money, she thought it was Young's responsibility to pay for the trip.  (*Id.*)  Young then asked Israel to purchase an airplane ticket to return home; she bought a ticket but asked to remain on the trip.  (*Id.* at ¶ 20.)  Young admits that on or around August 26, 2009, he made a comment about Israel's outfit that caused her to become enraged, throwing her car keys at him and personal objects out of the car.

(*Id.* at ¶ 23)  Young allegedly told her that her shirt "looked slutty," which Israel found to be degrading, offensive, and emotionally abusive.  (Israel Decl. ¶ 18, June 6, 2011.)

### 2. Allegations of Abuse by Depriving Israel of Food and Money

Israel claims that Young imposed financial control over her and provided her with only five dollars per day to spend on food.  (Israel Decl. ¶ 9, May 10, 2011.)   Young allegedly forced her to sit in the back seat of the car without food while he ate in the front seat.  (*Id.*)  She states that Young abandoned her at the Minneapolis Airport without any money to return home.  (*Id.* at ¶ 14.)

Young, on the other hand, says that he was given ten dollars per day for food expenses "by a filmmaker and a magazine editor" to help fund their work for *Skin Trade*. (Young Decl. ¶ 15.)  Young volunteered to share half of this food stipend with Israel. (*Id.* at ¶ 17.)  Young states that the two routinely spent more, and that each paid for food with their own out-of-pocket funds.  (*Id.*)  Young points out that there was additional food in the trunk of their car at all times.  (*Id.* at ¶ 18.)  Israel told him prior to the trip that she had a "safety net" of money to live on and during the trip she "regularly boasted about having a wealthy father who gave her a lot of money," including various "five-figure" checks.[3]  (*Id.* at ¶¶ 13-14.)After his dispute with Israel about finances, he told her they should not remain on the trip together and took her to the Minneapolis Airport. (Young Decl. ¶ 20, 23.)  Young believed that Israel had money to return home, based on her statements regarding money she received from her father and because he observed her buy dinner at a restaurant on the last day of the trip.  (*Id.* at ¶ 24.)

---

[3] Defendants interpose hearsay objections to these statements (Objections to Decl. at 2).  All of these statements, however, are admissible as party admissions.  Defendants also repeatedly assert relevance objections to these statements (*id.*).  These statements are relevant to Young's argument that he did not abuse Israel by withholding food or money from her because she had resources to provide for herself and was not dependent on him.  Defendants' evidentiary objections in this regard are therefore DENIED.

### 3.      Allegations of Abuse by Preventing Israel from Accessing Medical Treatment

Israel claims that she took a "Plan B" emergency contraceptive pill after another birth control method failed.  (Israel Decl. ¶ 10, May 10, 2011.)  After taking the pill, she began to feel ill, experiencing "fever, chills, tunnel vision, intense cramping and vomiting," which she believed to be an "abnormal" reaction to the medication.  (*Id.*)  Israel told Young that "[she] thought [she] should see a doctor."  (*Id.*)   Young then, according to Israel, "launched into a verbal attack on" her, said that they did not have time to see a doctor, and threatened to leave Israel at a truck stop.  (*Id.*)   Young did not allow her to rest or seek medical attention, instead forcing her to hike "several miles to perform the day's filming."  (*Id.*)  When she was unable to keep pace with Young while hiking, he "physically assaulted [her] by violently grabbing [her] arm and dragging [her] for portions of the hike."  (*Id.*)  Israel states that she felt like she "was going to die."  (*Id.*)  She declares that she was scared to go to the police because, as she is an activist, going to the police could put her "legal safety at risk."[4]  (Israel Decl. ¶ 11, June 6, 2011.)

Young's version of the events is that in or around July 2009, Israel told him that she felt ill.  (Young Decl. ¶ 8.)  Young asked her if she wanted to stay in the car rather than walk to a filming location that they were scheduled to visit that day.  (*Id.*)   Israel told him that she wanted to come to the film site, and that she voluntarily walked there.  (*Id.* at ¶¶ 8-9.)  Young denies that he forced Israel to walk anywhere at any point during the trip.  (*Id.* at ¶ 10.)

### 4.  Allegations that Young Sexually Abused Israel

Israel alleges that Young forced her to perform a sexual act on him against her will.  (Israel Decl. ¶ 11, May 10, 2011.)  She states that she voluntarily began providing him with oral sex before withdrawing her consent.  (*Id.*)  She told Young that she "would

---

[4] Young does not contend that he was defamed by Israel's statements regarding threats of putting her legal safety at risk.

not continue the act because [she] was tired and did not want to do it anymore."  (*Id.*)
Young demanded that she finish the act and yelled at her "in such a way that [she] feared
for [her] safety."  (*Id.*)  Israel declares that she complied with Young's demand "out of
fear."  (*Id.*)  Israel states that she was "later advised that even though [she] consented to
the sexual act, it is considered rape and sexual assault" if a person is coerced out of fear
to perform a sex act that she does not want to perform.  (*Id.*)

Young attests that he visited Los Angeles in or around October 2009, and saw
Israel for the first time since the road trip.  (Young Decl. ¶ 47.)  During that visit, Israel
"apologized for spreading false rumors about [Young] and said she was hurt by [Young]
breaking up with her."  (*Id.*)  Young states that, during that visit, the two slept in the same
bed together and engaged in sexual intercourse for two nights.  (*Id.*)  Young confronted
Israel about the allegations against him, and she responded, via email, as follows:

> No Peter, you weren't sexually improper by forcing me to do
> something I didn't want to do, you didn't rape me, but the
> degree of degradation you made me feel as the trip went on
> made me question the value of those acts to you.  I know what
> you're capable [of] in those regards, so it was easy for me to
> believe you just took me along for superficial reasons; I was
> faced with that theory several times on the trip.

(*Id.* at ¶¶ 48-49, Ex. J.)

Israel claims that she sent this email as a *quid pro quo* to get Young to participate
in the accountability process.  (Israel Decl. ¶ 16, June 6, 2011.)  Young allegedly refused
to participate in the process unless she "agreed to drop [her] allegations of sexual assault
against him in writing."  (*Id.*)  Israel states that she then wrote the above email because
she felt that his participation "in a structured accountability process to work on his
abusive behavior in general was more important."  (*Id.*)

//

//

-7-

### 5. Allegations that Young Sexually Abused Other Women

Israel claims that Sina Salessi told her that Young "had been accused of sexual assault by a friend of his" who wished to remain unnamed out of fear.  (Israel Decl. ¶ 17, June 6, 2011)  Ashley Strobelt informed Israel that her friend accused Young of sexual assault, but wished to remain unnamed.  (*Id.*; Strobelt Decl. ¶ 2.)

Young denies that he has ever sexually abused or assaulted any woman.  (Young Decl. ¶¶ 41-42.)

### 6. Allegations of Harm Resulting from Emotional Abuse

Israel claims that as a result of the abuse she suffered from Young, she had an emotional breakdown, for which she was taken by ambulance to a hospital, and that she has begun to see a therapist.  (Israel Decl. ¶ 16, May 10, 2011.)  She  suffered from emotional distress, lost twenty pounds, broke out in severe rashes, and her hair fell out.  (*Id.* at ¶ 15.)  She states that she has not had a normal menstrual cycle since the trip.  (*Id.*)

### 7. Jones' Allegation of Israel's Malicious Intent

In her declaration, Jordan Jones states that when she spoke with Israel in or around December 2009, Israel told her that she had "many accusations" against Young, and that she intended to publish them on the Internet in an effort to "ruin his reputation."[5]  (Jones Decl. ¶ 3.)  Jones claims that Israel wanted to know "who the most prominent animal rights activists" were in that city, and asked Jones if she would arrange meetings with them to discuss the accusations against Young.  (*Id.* at ¶ 4.)  Israel said that she wanted Young to be "run out of Salt Lake" and "blacklisted" from animal rights communities everywhere.  (*Id.* at ¶ 5.)  Israel also allegedly admitted to Jones that she had lied about Young refusing to take her to the hospital.  (*Id.* at ¶ 11.)

Israel denies that she ever told Jones that she intended to publish statements on the Internet to ruin Young's reputation.  (Israel Decl. ¶ 4, June 24, 2011.)

*//*

---

[5] Israel's statements to Jones are admissible as party admissions.

## C.   Alleged Defamatory Statements Made by Defendants

Young claims that after returning from the trip, he learned from his friends and from researching online, that Defendants Lungarelli and Weissman had been disseminating statements about him, his relationship with Israel, and his relationship with women in general.  (Young Decl. ¶ 25.)

### 1.  The Weissman Email

Young declares that he ran a Google search for his own name and discovered a website for a group called "Accountability Now."  (*Id.* at ¶ 26.)  The website contained a long thread of hundreds of emails, many of which contained accusations against Young.[6]  (*Id.*)  Young found one email on the website ("Weissman Email") sent from an email address which Young recognized as belonging to Israel.[7]  (*Id.* at ¶ 27.)  The Weissman Email contains an introductory statement which reads, "I think this was the final draft----h."  (Young Decl. ¶ 25, Ex. B.)

The body of the email is addressed "Hi Peter" and states in pertinent part:

> A number of women you were intimate with experienced verbal, emotional, or sexual abuse from you in the past several years.  More specifically, these experiences included coercion and sexual assault by forcing your former partner to engage in unwanted sexual activity and putting her sexual health at risk as well as neglect and threats of abandonment.  Furthermore, your former partner experienced threats of physical harm, legal

---

[6] Defendants make several best evidence rule objections to Young's declaration regarding statements found online.  Defendants ignore the fact that Young attached relevant text messages, websites, and emails as exhibits to his declaration.  Defendants' "best evidence" objections are overruled.

[7] Defendants object to Young's characterization of the emails found on the websites as sent by Defendants.  Defendants' objections are overruled because (1) Young merely states that the emails were sent from addresses that he recognized as belonging to Defendants, not that he knew the emails were sent personally by Defendants; and (2) Israel admits that she sent the email to Weissman.  (Young Decl. ¶¶ 27-28; Israel Decl. ¶ 3, June 6, 2011.)

1    action and that you would have alienated her from the animal
2    rights community if she told people about what happened. We
3    have documentation that you have taken legal action and
4    employed snitch-jacketing. . . .

5  (*Id.*)

6        Israel admits that she sent this email to her friend Weissman, but she describes it as
7  a draft email originally prepared by Weissman to invite Young to participate in the
8  accountability process. (Israel Decl. ¶ 3, June 6, 2011.) Israel states that Defendant
9  Weissman lost his copy of the email, so she sent a draft copy to him. (*Id.*) She never
10 published the email to the "Accountability Now" website. (*Id.*) Although Israel does not
11 explain in detail what allegations she discussed with Defendant Weissman which gave
12 rise to this email, it is reasonable to infer that Weissman obtained the factual allegations
13 contained in the email from Israel. Nor did Israel disavow any of the statements
14 contained in the Weissman Email when she sent the draft back to him or instruct him not
15 to disseminate it. Israel's declaration indicates that, at the very least, she expected
16 Defendant Weissman to send the email to Young as part of the accountability process.
17 (*Id.*)

18       There is no evidence that Defendant Lungarelli had anything to do with the
19 Weissman email and she denies that she has ever operated the Accountability Now
20 website. (Lungarelli Decl. ¶ 3.)

21       **2. The Friedman Email**

22       Young states that he viewed another email that was "posted to an email list" of
23 which he is a member ("the Friedman Email"). (Young Decl. ¶ 31, Ex. E.) The email
24 contains a message originally sent by Israel to Jerry Friedman and then forwarded by
25 Friedman to the listserv. (*Id.*) The Friedman Email forwarding Israel's email states:
26 //
27 //
28 //

> Colleagues,
>
> I don't know the truth or falsity of anything said by Peter or Nik, but the "accused" has not said anything.  For this reason, I am forwarding the statement of the "accused."
>
> I hope that sooner or later this helps end the controversy.
>
> -Jerry

(*Id.*)

Israel admits that she prepared the email and sent it to Friedman "in order to defend [herself] to the Galan List Serve from the false accusations" made by Young that Israel was an FBI informant.  (Israel Decl. ¶ 6, June 6, 2011.)

The body of Israel's email begins with the following statement:

> Here is my response in regards to Peter's claims (or rather, insinuations) that I am an FBI informant.[8]  Please forward with others and especially forward it to the list where Peter originally posted his attack.   Any and all questions are welcome.

(Young Decl. ¶ 31, Ex. E.)

In the Friedman Email, Israel explains how her relationship with Young began, and then describes the *Skin Trade* road trip in this way:

> On this trip last summer, Peter subjected me to emotional abuse, threatened me with abandonment, and put my sexual health and legal safety at risk, among other acts, all of which many activists have concluded was irresponsible and

---

[8] Young sent an email to the Galan listserv, the same forum on which the Friedman Email was posted, alleging that "the 19-year-old girlfriend of a 30-something man on this list," apparently referring to Israel and Young, respectively, had been engaging in "suspicious behavior" and was potentially an FBI informant.  (Israel Decl. Ex. A, June 6, 2011.)

-11-

> unacceptable.  Our relationship ended with the trip, when Peter
> dropped me off at the Minneapolis-St. Paul Airport with no
> money, no ticket, and only a partial of my belongings.

(*Id.*)  The Friedman Email goes on to discuss Israel's actions following the road trip and responds at length to Young's allegation that Israel was an FBI informant.  (*Id.*)  Israel denies the allegation and describes it as Young's "final power move" in an effort to silence her, and concludes with Israel stating that she believes the allegation is part of Young's effort to discredit her and to win back his lost supporters.  (*Id.*)

There is no evidence that Defendant Lungarelli was involved in the production or publication of the Friedman Email.

### 3.  The Community Alert Flyer

Young attests that he was handed a flyer ("Community Alert Flyer") by Defendant Weissman while attending the Animal Rights 2010 Conference on or around July 19, 2010.[9]  (Young Decl. ¶ 33.)  The flyer is labeled "Community Alert" at the top in large, bold letters, contains a picture of Young, identifies him by name, and states as follows:

> There are reports from multiple people that Peter Young has
> sexually assaulted women and engaged in coercion,
> manipulation and emotional abuse.  One individual who has
> gone public about her abuse was subject to harassment and
> threats and falsely labeled an informant by him.  This has
> created a chilling effect, making other women even more
> fearful of coming forward.  This climate of intimidation needs
> to be changed.  If you have been abused or have information

---

[9] Statements of Defendant Weissman to Young are admissible as party admissions.  Defendants object to the description of the Community Alert Flyer under the best evidence rule, ignoring the fact that Plaintiff merely quotes from the Flyer, which is attached as an exhibit to Young's declaration. Defendants' hearsay and best evidence objections are overruled.

1
2

       about    abusive    acts    committed    by    him,    email
reportabuse@riseup.net.

3

 (Young Decl. ¶ 33, Ex. F.)

4

    Kate Lungar states in her declaration that she attended the Animal Rights

5

Conference where Defendant Weissman handed the Community Alert Flyer[10] to her and

6

her friend and fellow conference attendee Laurie Harari.  (Decl. Lungar ¶¶ 2, 4-6, June

7

21, 2011.)  Lungar observed Defendant Weissman for at least two hours and witnessed

8

him distributing the flyers to "hundreds of people."  (*Id.* at ¶ 10.)

9

    Israel denies preparing the flyer, distributing the flyer, or instructing anyone to

10

distribute the flyer.  (Israel Decl. ¶ 12, June 6, 2011.)  She admits that she "was aware"

11

that Defendant Weissman  prepared the flyer "in order to ascertain if there were other

12

women hurt" and that the allegations in the flyer were based on statements made by her

13

to Defendant Weissman.  (*Id.*)  Young points out that, in a message posted to the

14

Accountability Now website, Israel refers to the accusations in the Community Alert

15

flyer as "my accusations."  (Young Decl. ¶ 35, Ex. G.)

16

    Defendant Lungarelli did not prepare the Community Alert flyer, did not distribute

17

it, and did not instruct anyone to distribute it.  ( Lungarelli Decl. ¶ 7, June 6, 2011.)

18

    **4.  The Regan Email**

19

    In her declaration, Lauren Regan attests that on August 9, 2010, she received an

20

email from Israel (the "Regan Email"), stating:

21

      I feel the need to follow up with you after our discussion in

22

      Portland.  However brief, you are mistaken:  Peter has multiple

23

      accusations  of  sexual  assault  against  him,  predating  my

24

      experience with him . . . many activists do not feel safe in his

25

      presence and are now insisting that he is not conducive to a

26
27
28

---

[10] Attached to Lungar's Declaration is a photocopy of a flyer, identical to the flyer submitted by Young.  (Decl. Lungar at Ex. A.)

healthy community if his wrongdoings against women are not addressed and accounted for.  As a female activist, and especially as someone who has been wronged by Peter, I support their stance.  Peter sent a Cease and Desist to a woman that I had no association to, because she was mobilizing against him with such accusations:  the "attack" you spoke of is about something much larger than Peter and I.

It is not my struggle to "out" Peter for what he is, but I will not exhaust my time to tell others not to.

(Regan Decl. ¶ ¶ 2-3, Ex. A, June 20, 2011).

Israel admits that she sent the Regan Email.  (Israel Decl. ¶ 17, June 6, 2011.)  She sent the email because she felt that Young is dangerous to young women in the animal rights movement and to the community in general.  (*Id.*)  She held this belief based on what she heard from her friend Sina Salessi, who told her that one of Salessi's friends had been sexually assaulted by Young but wished to remain unnamed out of fear.  (*Id.*)  Israel also heard from Ashley Strobelt that her friend, who also wished to remain nameless out of fear, accused Young of sexual assault.  (*Id.*)

There is no evidence that Defendant Lungarelli participated in the production or publication of the Regan Email.

**5. The Lungarelli Email**

Young also discovered on the "Accountability Now" website two emails from Defendant Lungarelli.[11]  (Young Decl. at ¶ ¶ 29-30.)  The first email ("Philly Email") states:

There's a collective in philly who [sic] was going to show bold native, but now in stead would like to know what survivors are asking that they do.  They've already publisized [sic?] that they

---

[11] Young met Defendant Lungarelli when she and Israel were roommates.  (Young Decl. ¶ 28.)

will show bold native, but upon hearing peter is in it and a
rapist, they'd like to know what survivors would like them to
do.  can someone tell me what is a good solution to this
problem.  Ie.  do we want to ask them not to show it?  Do we
want to ask that they talk about abuse in the movement
before/after the video?  ideas?

(Young Decl. ¶ 29, Ex. C.)

Defendant Lungarelli sent this email privately to Defendants Weissman and Israel
and never published it on the Internet or posted it to the Accountability Now website.
(Lungarelli Decl. ¶ 12, June 6, 2011.)  She never responded to the email from the group
in Philadelphia.  (*Id.* at ¶ 4.)

### 6. The Camille Email

Young discovered an email on the Accountability Now website sent from
Defendant Lungarelli "to a woman named Camille."  ("Camille Email") (Young Decl. ¶
30.)  The Camille Email contains two parts. First, a note which states:

Adam, I wrote a reply to Camille-- Of course you'll be the one
sending it-- so edit it or throw it away, as she sent the message
to you, but I'm happy to follow up with her with something in
regards to the documents that I sent her.  But, I was just so mad
thinking [about] this that I did draft a possible reply to Camille.

(Young Decl. ¶ 30, Ex. D.)

The remainder of the email states:

Dear Camille,

I'm sorry to hear that you have been misinformed . . . We had
hoped to find support in you, because you have been a strong
female in the movement for a long time now, and we had hoped
that you would be able to clearly see through these tactics that
Peter initiates.  Recently, Peter has actually been losing people

-15-

who had been "long time supporters" as his lies and danger to the movement is [sic] becoming more and more apparent . . . As far as personal vendettas please understand that most of the people who are seeking accountability from Peter currently have not actually had no personal bad experiences with Peter, but rather have made the decision to believe and support survivors, as their stories hold truth . . . There are still many womyn who have been affected by Peter that are afraid to come forward because of the witch hunt and scare tactics being used against them by Peter.

(*Id.*)

Defendant Lungarelli states that this was a "private e-mail" sent to Defendant Weissman at "his personal e-mail address as contained on a list serve," and that she "never published this e-mail to the Internet."  (Lungarelli Decl. ¶ 5, June 6, 2011.) Defendant Lungarelli prepared the email as a draft response to a woman who sent an email to Defendant Weissman.  (*Id.*)  While she told Defendant Weissman that he could edit the proposed response or delete it, she did not know if he ever sent the message. (*Id.*)

### 7.  The Wikipedia Page

Young alleges that in or around November, 2010, he visited a Wikipedia page about him that used the same language that was on the Community Alert Flyer and accused him of sexually assaulting women.  (Young Decl. ¶ 37.)  The Wikipedia page stated, in relevant part:

Young has been accused by activists of using his status to sexually manipulate and abuse females.  These accusations resulted in the distribution of a flyer accusing Young of "sexually assaulting women and engaging in coercion,

1             manipulation, and emotional abuse."  The flyer claimed one of

2             the women was "falsely labeled an informant" by Young.

3  (Young Decl. ¶ 37, Ex. H.)

4      Israel states that she has "never modified the Wikipedia page for Peter Young,"

5  and that she did not insert the specific language quoted above.  (Israel Decl. ¶ 13, June 6,

6  2011.)

7      Defendant Lungarelli has "never modified the Wikipedia page for Peter Young,"

8  and did not insert the above-quoted language into that page.  (Lungarelli Decl. ¶ 18, June

9  6, 2011.)

10      **8.  The YouTube Video**

11      Around late December 2010, Young viewed a video posted on YouTube that

12  contained an image of the Community Alert Flyer ("YouTube Video").  (Young Decl. ¶

13  38.)

14      Israel denies that she has ever "prepared or posted any YouTube videos" about

15  Young.  (Israel Decl. ¶ 14, June 6, 2011.)  She indicated in an email she sent to Faith

16  Gundran and Defendants Lungarelli and Weissman, which was posted to the

17  Accountability Now website, that she did not know who created the video and that it

18  should be taken down.  (*Id.*)  Israel stated in that email:

19             Does anyone know who this Sfactor3 person is, who posted

20             these videos on Youtube?  I've emailed them twice asking them

21             to pull them down, citing reasons such as these videos will

22             cause the survivors and supporters harm, and that this person

23             isn't even familiar with the specific accusations (my

24             accusations) on the flyer.  In addition to this, I told them that

25             the particular flyer had a very specific use, and that they need to

26             either take the video down and make a separate flyer so as to

27             not co-opt something out of context, or get in touch with the

28             accountability group.

1         Anyways, if any of you know who this is[,] tell them to pull

2         down this video.  Thanks.

3    (Young Decl. ¶ 35, Ex. G.)

4        There is no evidence that Defendant Lungarelli prepared or posted any You Tube

5    videos about Young.  (Lungarelli Decl. ¶ 10, June 6, 2011.)

6    **9.  The Activist Abuse Website**

7        On   or   around   January,   2011,   Young   visited   a   website   at

8    http://activistabuse.wordpress.com ("Activist Abuse Website") that contained multiple

9    accusations against him.  (Young Decl. ¶ 39, Ex. I.)     The messages on the website

10   discuss such issues as whether "an individual attempted to trace our IP," the removal of

11   allegations of abuse from the Internet, threats against women who made allegations

12   against Young, and the impact of Young's actions on Israel.  (*Id.*)  One message states:

13        There  are  reports  from  multiple  people  that  animal  rights

14        activist  Peter  Young  engaged  in  coercion,  manipulation,  and

15        emotional  abuse  of  women.   One  individual  who  has  gone

16        public  about  her  abuse  was  the  subject  of  harassment  and

17        threats and falsely labeled an informant by him.

18   (*Id.*)

19       Israel denies having any role in the operation of the Activist Abuse website and

20   insists that she has never made any posts to that website.  (Israel Decl. ¶ 15, June 6,

21   2011.)

22       No evidence implicates Defendant Lungarelli with regard to the Activist Abuse

23   website.  (Lungarelli Decl. ¶ 9, June 6, 2011.)

24   **III.**

25   **LEGAL STANDARDS GOVERNING CALIFORNIA ANTI-SLAPP MOTIONS**

26       California's statute prohibiting Strategic Lawsuits Against Public Participation (the

27   "anti-SLAPP statute"), Cal. Civ. Proc. Code § 425.16, provides a mechanism for the

28   "early dismissal of meritless lawsuits aimed at chilling expression through costly, time-

-18-

consuming litigation." *Northon v. Rule*, 637 F.3d 937, 938 (9th Cir. 2011) (citing *Gardner v. Martino*, 563 F.3d 981, 986 (9th Cir. 2009)). Under the anti-SLAPP statute, defendants may bring a special motion to strike a cause of action, which should be granted if (1) the cause of action arises from any act by the defendants in furtherance of their free speech rights under the federal or state constitution; (2) the act is "in connection with a public issue"; and (3) the plaintiff fails to establish a probability that he will prevail on the claim. Cal. Civ. Proc. Code § 425.16(b)(1).

To establish a probability of prevailing on a claim, the plaintiff must meet a standard "comparable to that used on a motion for judgment as a matter of law." *Price v. Stossel*, 620 F.3d 992, 1000 (9th Cir. 2010) (citing *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 840 (9th Cir. 2001)). Thus, the plaintiff "must demonstrate that the complaint is legally sufficient and supported by a prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." *Id.* (quoting *Metabolife*, 264 F.3d at 840) (internal quotation marks omitted). If the plaintiff fails to present a sufficient legal basis for the claims or if the evidence offered is insufficiently substantial to support a judgment in favor of the plaintiff, then the defendant's anti-SLAPP motion should be granted. *Id.*

## IV.

## DEFENDANTS' ALLEGATIONS WERE MADE IN FURTHERANCE OF THEIR RIGHT TO FREE SPEECH IN CONNECTION WITH A PUBLIC ISSUE

Section 425.16(e) defines an "act in furtherance of a person's right of petition or free speech under the United States or California constitution in connection with a public issue" to include:

> any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest [and] any other conduct in furtherance of the exercise of . . . the constitutional right of free speech in connection with a public issue or an issue of public interest.

Cal. Code Civ. Pro. § 425.16(e) (emphasis added).

The Court and the Legislature have provided only general parameters for determining whether an issue is one "of public interest." *Hilton v. Hallmark CARDS,* 599 F.3d 894, 905 (9th Cir. 2010). First, the anti-SLAPP statute does not exclude any particular types of actions from classification as SLAPP suits. *Id.* Accordingly, the Court must focus on Defendants' activity giving rise to their alleged liability. *Id.* Second, the activity need not involve questions of civic concern, and it is not necessary that the alleged activity involve public officials. *Id.* Third, the anti-SLAPP statute is to be interpreted broadly in order "to encourage continued participation in matters of public significance." Cal. Civ. Proc. Code § 425.15(a); *see also M.G. v. Time Warner, Inc.*, 89 Cal. App. 4th 623, 627-28 (2001).

The California Courts of Appeal have expressed doubt that "an all-encompassing definition [of 'an issue of public interest'] could be provided." *Weinberg v. Feisel*, 110 Cal. App. 4th 1122, 1132 (2003). The courts have instead identified categories of issues of public interest. *Id.* at 1132-33; *Rivero v. American Federation of State, County, and Municipal Employees, AFL-CO*, 105 Cal. App. 4th 913, 924 (2003).

## A. <u>Allegations Against Young Are Not of Widespread Public Interest</u>

The majority of public interest cases involve issues of "*widespread* public interest" of the type that judges and attorneys should "know [to be] a matter of public concern when they see it." *Du Charme v. Int'l Bhd. of Elec. Workers, Local 45*, 110 Cal. App. 4th 107, 117 (2003); *see also Hilton*, 599 F.3d at 898, 907 (finding that there was "no dispute" that the career and image of Paris Hilton, a "controversial celebrity" known for "her lifestyle as a flamboyant heiress" and for starring in a reality television program, was of public interest); *Seelig v. Infinity Broad. Corp.*, 97 Cal. App. 4th 798, 807-08 (2002) (holding that discussions about a contestant on *Who Wants to Marry a Millionaire*, a national television show, were of public interest because the show successfully generated viewership and sparked a media debate about reality television). Widespread public interest cases include those relating to persons or entities "in the

public eye," actions "that could directly affect a large number of people beyond the direct participants," and other topics "of widespread, public interest." *Rivero*, 105 Cal. App. 4th at 924.

When an issue relates to a limited but definable portion of the public, however, a statement about that issue will only be considered of public interest if it is "in the context of an ongoing controversy, debate or discussion within that community." *Du Charme*, 110 Cal. App. 4th at 118 (defining "limited but definable" populations to include communities of interest such as a 3,000-member homeowner association and a 10,000-member union local).  Anti-SLAPP protection for statements made in a debate or discussion within a limited community encourages participation therein.  *Id.*

The Court finds that, while issues of animal rights and domestic violence may be of general widespread public interest, the present controversy relating to Young is not. Defendants argue that Young has achieved "such pervasive fame that he has become a public figure for all purposes and contexts," citing his fame within the animal rights movement, his appearance in two films, his speaking engagements, his Wikipedia page, the fact that he was "one of the first" individuals to be prosecuted under the animal terrorism act, his website, his interviews, his videos posted to YouTube, and the fact that he has been "portrayed as a villain" by the fur industry.[12]  (Reply 5-6.)  Young has not, however, received general notoriety or been the focus of national media attention, unlike the plaintiffs in *Hilton* and *Seelig*, who were both featured in high-profile nation-wide television programs and were the subject of pervasive media interest.  The allegations of sexual and domestic abuse against Young are of even less widespread public concern than his activism in general, having garnered no public or media attention outside of the

---

[12] The parties do not directly address whether the statements concern an issue of widespread public concern or an issue of concern to a limited community, discussing instead whether Young is a limited or all-purpose public figure.  The Court considers these arguments to the extent they are relevant to the question of whether the allegations are of widespread public concern.

animal rights movement, despite the publication of the allegations and their availability to the general public.

The allegations at issue herein are of interest only to the animal rights movement and community, which is a "limited but definable portion of the public," and are thus, as discussed further below, subject to the *Du Charme* restriction that any statements must be made in relation to an "ongoing controversy, debate, or discussion" within the movement in order to be protected by the anti-SLAPP statute.

**B.   Allegations of Abuse Were Made as Part of an Ongoing Discussion and Controversy Within the Animal Rights Movement**

Allegations of sexual abuse can be of public interest when they are made as part of an ongoing discussion within a limited but definable community.   *Terry v. Davis Community Church*, 131 Cal. App. 4th 1534, 1549-50 (2005) (holding that allegations of predatory behavior against minors by the husband of a youth minister were of public interest within a church community as part of an ongoing debate about how to keep predators out of positions of power within the church).   Such allegations are not of public interest when they concern parties and matters "entirely outside the public eye." *Carpenter v. Jack in the Box Corp.*, 151 Cal. App. 4th 454, 472 (2007) (holding that allegations of sexual harassment against a restaurant employee were not of public interest); *see also Olaes v. Nationwide Mutual Ins. Co.*, 135 Cal. App. 4th 1501, 1510 (2006) (holding that the "general public interest" in fairly resolving sexual harassment claims "does not bring a complaint alleging defamation during a sexual harassment investigation into [anti-SLAPP statute's] ambit").

The allegations about Young were of public interest within the animal rights community.   Excerpts of a discussion from the "Activist Abuse" website demonstrate that there was an ongoing discussion among members of the animal rights community about how to deal with sexual abuse and domestic violence within the movement:

> We are providing information about Young's abuse to protect
> other Womyn. To make sure he never abuses other Womyn

again.   This site is a public service for the animal rights
movement.  By sharing this information we are helping to build
a safer environment for Womyn in the movement.

To do this we need to start addressing Young's action.   We
want the animal rights movement to be a vibrant and safe
movement and Young's behavior brings down the movement.
We intend to bring the animal rights movement up.

(Young Decl. ¶ 39, Ex. I.)

Another message on the "Activist Abuse" website described the allegations against Young as part of a larger accountability process within the movement:

This website serves as [a] place to report abuse in activist
movements in order for these activists to go through an
accountability process.   Information is made public here in
order to confront and have the activist in question be
accountable for their actions and make social justice
movements better and more effective.   Abuse is abuse, no
matter who engages in it[,] and to make our movements better
we must confront this problem.

(*Id.*)

In the Weissman Email, Israel explicitly states that her purpose in making allegations against Young was to hold him accountable using the internal mechanisms of the animal rights movement because she lacked trust in the court system and preferred to use community reconciliation techniques instead:

We ask this [for Young to enter into an accountability process]
because we believe what is best for the movement as a whole
(including [Young] and the survivors) is for this to be dealt with
respectfully and responsibly outside of the criminal (in)justice
system in a process that includes experienced facilitators and

> friends and/or family that can support you in addressing the
> harm from your actions.

(Young Decl. ¶ 27, Ex. B.)

The efforts to ensure that women feel safe in the animal rights community and to hold abusers accountable so that they could correct their actions while remaining members of the community predate the allegations against Young. The discussions on the website illustrate that the movement had procedures in place for dealing with such allegations and a long-standing interest in correcting the type of behavior of which Young was accused. Effectively deploying a mechanism to correct abusive behavior is of public interest within the animal rights community in the same way that, in *Terry*, performing investigations of church leaders to prevent predators from having access to minors was of public interest within the church community.

In sum, discussions about stopping abusive behavior within the animal rights movement were ongoing before Defendants published their allegations against Young. A broad reading of the anti-SLAPP statute to encourage participation in discussions concerning matters of public interest requires the Court to find that discussions about sexual abuse and domestic violence by leaders of the animal rights movement are matters of public interest. Defendants have thus succeeded in making a *prima facie* showing that their allegations were related to an issue of public interest.

## V.

## CLAIMS ON WHICH YOUNG HAS SHOWN A PROBABILITY OF PREVAILING

**A.**   **Legal Standard for Determining Whether Young Has Shown a Probability of Success on His Defamation Claims**

Having determined that the anti-SLAPP statute covers the acts giving rise to this suit, the Court must now determine whether Young has demonstrated a probability of success on his claims. *Terry*, 131 Cal. App. 4th at 1551. The Court considers all pleadings and evidentiary submissions of the parties in determining whether Young has

demonstrated a probability of success, but does not weigh "the credibility or comparative strength of the evidence." *Id.* The Court will only consider "competent and admissible evidence." *Gilbert v. Sykes*, 147 Cal. App. 4th 13, 26 (2007) (internal citations omitted). Young must make a showing of facts "which would, if credited, support a judgment in his favor." *Conroy v. Spitzer*, 70 Cal. App. 4th 1446, 1446-47 (1999). Defendants' anti-SLAPP motion will be granted if Young "presents an insufficient legal basis for the claims or when no evidence of sufficient substantiality exists to support a judgment" for Young. *Metabolife*, 264 F.3d at 840.

**B.   Young's Probability of Prevailing on Claims of Defamation**

Defamation under California law involves "the intentional publication of a statement of fact which is false, unprivileged, and has a natural tendency to injure or which causes special damage." *Price*, 620 F.3d at 998 (quoting *Gilbert*, 147 Cal. App. 4th at 27).

**1.   Statements Must Have Been Published By Defendants**

To prevail on a claim of defamation, Young must demonstrate that the alleged defamatory statements were in fact published. *Dible v. Haight Ashbury Free Clinics*, 170 Cal. App. 4th 843, 854 (2009). Publication means "communication to some third person who understands the defamatory meaning of the statement." *Id.* When a defamatory statement is republished by a third party, "the originator of defamatory material is also liable for each such repetition if [s]he could reasonably have foreseen the repetition." *Id.*; *see also Mitchell v. Superior Court*, 37 Cal. 3d 268, 281 (1984) (holding that "the original defamer is liable if either the repetition was authorized or intended by the original defamer or the repetition was reasonably to be expected") (internal citations and quotation marks omitted). Each publication of the defamatory statement by the original defamer gives rise to a separate cause of action, and each repetition of the defamatory statement by a new party also gives rise to a separate cause of action against the original defamer "when the repetition was reasonably foreseeable." *Shively v. Bozanich*, 31 Cal. 4th 1230, 1242-43 (2003).

When a claim of defamation is based on the republication of the statements, the "defamatory meaning must be found, if at all, in a reading of the publication as a whole," *i.e.*, examining the complete original statements of a defendant, and not "based on snippets taken out of context." *Crowe v. County of San Diego*, 608 F.3d 406, 443 (9th Cir. 2010) (internal citations and quotations omitted) (holding that a defamation action based on a television interview given by defendants must be "analyzed in the context of the entire interview, not just the portion the program chose to air"); *see also Metabolife*, 264 F.3d at 847-48 (holding that a defendant was only liable for his comments "in their full and complete form, not the sound bites they became" when the statements were edited and broadcast in an interview).

## 2. Statements Must Contain an Assertion of Objective Fact to be Actionable for Defamation

A statement is protected by the First Amendment against any defamation claim unless that statement contains a "provably false factual connotation." *Crowe*, 608 F.3d at 443. The Court, in assessing whether a statement contains a provable false factual connotation, must first ask the threshold question of whether a "reasonable factfinder [would] conclude that the contested statement implies an assertion of objective fact." *Id.* (quoting *Gilbrook v. City of Westminster*, 177 F.3d 839, 861-62 (9th Cir.1999)). The Ninth Circuit applies the following three-part test:

> First, we look at the statement in its broad context, which includes the general tenor of the entire work, the subject of the statements, the setting, and the format of the work. Next we turn to the specific context and content of the statements, analyzing the extent of figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation. Finally, we inquire whether the statement itself is sufficiently factual to be susceptible of being proved true or false.

1    *Id.* (quoting *Gilbrook*, 177 F.3d at 862).

2           **3.    Young Must Show That Defendants Acted With Actual Malice**

3           The United States Supreme Court has limited the ability of public figures to

4    recover damages for defamatory falsehoods to actions that were carried out with actual

5    malice because public figures "usually enjoy significantly greater access to the channels

6    of effective communication and hence have a more realistic opportunity to counteract

7    false statements than private individuals normally enjoy." *Gertz v. Robert Welch, Inc.*,

8    418 U.S. 323, 344, 94 S.Ct. 2997 (1974).   An individual can be either an "all purpose

9    public figure" who has such "pervasive fame or notoriety that he becomes a public figure

10   for all purposes and in all contexts," or a "limited purpose public figure" who

11   "voluntarily injects himself or is drawn into a particular public controversy and thereby

12   becomes a public figure for a limited range of issues." *Khawar v. Globe Intern., Inc.*, 19

13   Cal. 4th 254, 263 (1998) (citing *Gertz*, 418 U.S. at 351) (internal quotation marks

14   omitted).   A limited purpose public figure is only considered a public figure for the

15   purpose of a defamation case if the alleged defamation is "germane to the plaintiff's

16   participation in the controversy." *Gilbert*, 147 Cal. App. 4th at 24 (internal citations

17   omitted).

18          To prevail on a claim of defamation, a public figure (or limited public figure) must

19   demonstrate that a defendant acted with actual malice; that is, "with knowledge that [the

20   defamatory statement] was false or with reckless disregard of whether it was false or

21   not." *US v. Alvarez*, 617 F.3d 1198, 1221 (9th Cir. 2010) (quoting *New York Times Co.*

22   *v. Sullivan*, 376 U.S. 254, 268, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).   The actual malice

23   standard for a claim of defamation by a public figure also applies to claims of false light,

24   *Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1084 (9th Cir. 2002), and intentional infliction of

25   emotional distress. *Hustler Magazine v. Falwell*, 485 U.S. 46, 56, 108 S.Ct. 876 (1988);

26   *see also Reader's Digest Assn. v. Superior Court*, 37 Cal.3d 244, 265 (1984) (holding

27   that actual malice must be proved for a public figure's claims of false light and

28

intentional infliction of emotional distress because the "constitutional protection does not depend on the label given the stated cause of action").

Proving actual malice is "a heavy burden, far in excess of the preponderance sufficient for most civil litigation." *Solano*, 292 F.3d at 1084 (internal citations and quotation marks omitted). Actual malice requires, at a minimum, that Defendants acted with "reckless disregard for the truth," making the false statements with either a "high degree of awareness of probable falsity, or must have entertained serious doubts as to the truth" of the statements. *Id.* at 1085 (quoting *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 666-67, 109 S.Ct. 2678 (1989)) (internal quotations and alterations omitted). Actual malice does not require a showing that Defendants acted with hatred or ill will in making a statement; instead, Young must show that Defendants failed to act "with reasonable care in checking on the truth or falsity of the information before publishing it." *Carney v. Santa Cruz Women Against Rape*, 221 Cal. App. 3d 1009, 1016 (1990) (reasoning that a Defendant can both make a statement out of hatred or ill will while also exercising reasonable care). Young, in order to prove actual malice, "may rely on circumstantial evidence, including evidence of motive. . . ." *Khawar*, 19 Cal. 4th at 275.

On the record presented, the Court finds that Young, having injected himself into the animal rights controversy as a high profile leader and speaker, is a limited purpose public figure. Young has not achieved any general fame and notoriety beyond the confines of issues and debates relating to animal rights. Members of the animal rights movement and community, as discussed above, were concerned about the allegations against Young because the actions called into question both the danger posed by Young to women in the animal rights community and Young's commitment to the movement's values. Thus, the allegations of sexual abuse and domestic violence against Young were germane to his role as a limited public figure, and Young must prove actual malice to succeed on his claims against Defendants.

### 4.  The Allegations Against Young Have a Natural Tendency to Injure

Young argues that Defendants' statements have a natural tendency to cause and have actually caused injury.  Young contends that the allegations exposed him to contempt and ridicule, hurt his reputation within the animal rights movement, reduced his income by preventing him from being hired at speaking engagements, and caused him to suffer from deep depression.  (Young Decl. ¶¶ 54-55.)  Defendants do not dispute Young's claim that the allegations both had a tendency to cause injury and caused actual injury.  The Court agrees with Young that the allegations of sexual abuse and domestic violence had a natural tendency to cause injury and caused Young to suffer "hatred, contempt, [and] ridicule," which caused him injury "in his occupation."  Cal. Civ. Code § 45.

### B.  Published Statements Giving Rise to Claims Against Israel

### 1.  The Weissman Email

The Weissman Email contains four injurious allegations:  (1) a number of women had been verbally, emotionally, or sexually abused by Young; (2) Young coerced and sexually assaulted a former partner by forcing her to engage in unwanted sexual activity; (3) Young put a former partner's sexual health at risk; (4) Young neglected and threatened to abandon a former partner; and (5) Young threatened a former partner with physical harm.

Israel argues that she is not liable for the Weissman Email because the draft was prepared by Defendant Weissman and she only emailed the draft back to him and did not publish it on the Internet.  (Reply at 12.)  Israel admits in her declarations, however, that she discussed the allegations against Young with Defendant Weissman, that she knew about the Weissman Email, and expected Defendant Weissman to send it at least to Young.  There is sufficient evidence to support a finding that the republication of the allegations via the Internet was reasonably foreseeable because the Weissman Email discussed resolving the dispute over the allegations in an accountability process within the movement involving facilitators, friends, and family.  Young has thus demonstrated a

probability of prevailing on the argument that Israel is liable for the publication of the Weissman Email.

There also is sufficient evidence to support a finding that the Weissman Email contains assertions of objective fact:  due to Young's alleged misconduct, the email was sent as an attempt to engage Young in an accountability process, a formal procedure implemented by community members.  The seriousness of the attempt to invoke a formal process and the lack of any apparent figurative or hyperbolic language in the Email would support a finding that the Email contains allegations of fact.  (Young Decl. ¶ 25, Ex. B.)

Young has presented evidence that would, if credited by the trier of fact, support a finding that all or most of the allegations contained in the Weissman Email are false.  This evidence includes the following:  (1) Israel's alleged admission that Young did not sexually abuse her or was not sexually inappropriate towards her (Bruce Decl. ¶¶ 13); (2) Israel never asked to be taken to the hospital and she voluntarily hiked to a film site with Young after she refused his suggestion that she stay in the car when she felt ill (Young Decl. ¶¶ 8-10, 12; Jones Decl. ¶ 11); (3)  Young asked Israel if she wanted to leave, but never threatened to abandon her, and only left her at the airport because he believed, and she in fact had, purchased an airplane ticket and had money to get home (Young Decl. ¶¶ 13-14, 20, 22-24; Jones Decl. ¶ 9); (4) Young never physically harmed or starved Israel (Young Decl. ¶¶ 10-11, 17-18, 24; Jones Decl. ¶ 8); and (5) even after she made accusations against Young, Israel continued to inform Young that she was still in love with him and wanted to see him again, that she was hurt because he broke up with her, and that she would "ruin his reputation."  (Young Decl. ¶¶ 46-47, 50; Jones Decl. ¶¶ 3-5).

Young has submitted substantial evidence that, if credited, would support a finding that Israel acted with actual malice when making her allegations against Young because

she knew them to be false.[13]  If the factfinder credits Young's evidence, that factfinder could then infer that Israel knew her allegations against Young were false or, at minimum, that she had serious doubts as to the truth of her allegations, supporting a finding of actual malice.

Young presents no evidence to refute the declarations of Defendants Israel, Lungarelli, and Stobelt, which state that Israel was informed by Salessi and Strobelt that other women were abused by Young.  Thus, no inference can be drawn that Israel acted with actual malice in making her allegations that other women reported being abused by Young.  Young's blanket denial that he has ever abused any women falls far short of the heavy burden of proving actual malice with respect to Israel's claims that other women reported being abused.  Young therefore has not demonstrated a probability of prevailing on his claim of defamation insofar as it is based on Israel's allegations that other women reported being abused by Young.

### 2.  The Friedman Email

The Friedman Email contains allegations that Young subjected Israel to emotional abuse, put her sexual health at risk, threatened to abandon her and then dropped her off at the airport with no money, no ticket, and no belongings.

Israel is responsible for the publication of the Friedman Email because she sent it to Friedman in order "to defend [her]self to the Galan List Serve."  (Young Decl. ¶ 31,

---

[13] As a general matter, Jones' declaration that Israel made her allegations with the intent to ruin Young's reputation is not dispositive of the question of whether Israel acted with actual malice.  Israel's subjective motive for making her allegations is not coextensive with the inquiry into whether she acted with actual malice for the purposes of First Amendment protection.  *Carney*, 221 Cal.App.3d at 1016.  "Actual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will."  *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) (citations omitted).  Nonetheless, "[b]ias may support a showing of actual malice, but bias evidence is not sufficient by itself to support a claim . . . ."  *Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1119 (9th Cir. 2003) (Kozinski, J., dissenting from denial of reh'g *en banc*).  While "motive cannot, by itself, prove actual malice, it nonetheless is a relevant factor bearing on the actual malice inquiry."  *Id*. at 1136.

Ex. E.)  Israel thus intended that the Email be published, and she is therefore potentially liable for any defamatory statements contained therein.

A factfinder could, as explained above with regard to the Weissman Email, reasonably find that the statements in the Friedman Email also were assertions of objective fact, false, and made with actual malice.  Thus, Young has submitted sufficient evidence to demonstrate a probability of success on a claim of defamation against Israel based on the Friedman Email.

### 3.  The Community Alert Flyer

The Community Alert Flyer reports the existence of allegations by multiple women that Young sexually assaulted, coerced, manipulated, and emotionally abused them and urges people to report information about abuse by Young.

Israel admits that she discussed these allegations with Defendant Weissman and that she was aware that he was preparing the community alert flyer for distribution to determine if other women had been sexually abused by Young.  She thus contributed to the production of the flyer and reasonably foresaw that it would be published to third parties.

As discussed above, however, Young has submitted no evidence that would support a finding that Israel acted with actual malice in publishing reports of abuse experienced by other women or by urging those who claim to have experienced such abuse to report it.  Moreover, the Community Alert Flyer does not go into as much detail as the Weissman and Friedman Emails do regarding Israel's personal grievances against Young.  Young has not alleged that the remaining allegations in the Flyer are either false or injurious.  Thus, Young has not demonstrated a probability of prevailing on a claim of defamation based on the Community Alert Flyer, and the motion to strike is GRANTED with respect to the Flyer.

### 4.  The Regan Email

Israel is responsible for the publication of the Regan email because she admits that she wrote the email and published it by sending it to Regan.  The email contains multiple

accusations against Young of sexual abuse of other women; the email does not recount or discuss the specific allegations made by Israel regarding their road trip.

As discussed above, Young has submitted no evidence that could support a finding that Israel acted with actual malice in making allegations regarding reports of abuse of other women.  Therefore, the special motion to strike is GRANTED with respect to the Regan Email.

### 5.  The Lungarelli Email

The Lungarelli Email discusses an activist group in Philadelphia that was trying to decide, in light of the allegations against Young, whether to show a documentary featuring him.  The dissemination of the rumor that Young is a rapist is reasonably foreseeable as a result of Israel publishing her allegations against Young, and she is thus potentially liable for the Lungarelli Email insofar as a factfinder determines that it contains statements of objective fact that are false.

The special motion to strike with respect to the Lungarelli Email is GRANTED as to Lungarelli, but DENIED as to Israel.

### 6.  The Camille Email

The Camille Email does not directly reiterate any of the allegations of sexual, emotional, and physical abuse against Young.  In that email, Defendant Lungarelli merely asserts her justifications for believing the stories of women who alleged that Young abused them.  A statement of reasons why Lungarelli chooses to believe one of a set of competing narratives, without discussing and affirming the truth of those narratives, is not an objectively provable statement of fact and is thus not actionable for defamation. The special motion to strike is GRANTED with respect to the Camille Email.

### 7.  The Wikipedia Page

The Wikipedia Page states that Young has been accused of sexual and emotional abuse by multiple women and describes the Community Alert Flyer, but does not include any factual discussion or any indication as to whether the allegations are, in fact, true.

The statements in the Wikipedia Page truthfully report that such allegations were made and thus are not actionable for defamation.

The special motion to strike is GRANTED with respect to any claims based upon the Wikipedia Page.

### 8.  The YouTube Video

Israel denies, and Young does not present any evidence, that she contributed to the statements found in the YouTube Video.  The video contains an image of the Community Alert Flyer.  While there is no evidence that Israel posted the video herself, it was reasonably foreseeable that the flyer, which was distributed to hundreds of people would be reproduced in some form, online or physically, and distributed to other activists.  As Israel is responsible for the publication of the flyer, as discussed above, she is also responsible for its republication in the YouTube Video, which was reasonably foreseeable.

The only arguably injurious statements contained in the video, however, are those relating to the allegations of Young's abuse of other women.  As discussed above in connection with the Community Alert Flyer and the Wikipedia Page, there is no evidence that Israel acted with actual malice in reporting that other women had leveled accusations against Young.  Thus, the special motion to strike is GRANTED with respect to claims based upon the YouTube Video.

### 9.  The Activist Abuse Website

The Activist Abuse Website contains statements that:  (1) Young has abused women; and (2) one woman who went public about her abuse has been subject to harassment and falsely labeled an informant.  Israel denies having any role in the operation of this website and there is no evidence contradicting her.  Young has not alleged that the statement that he harassed or labeled Israel an informant is false or injurious.  As there is evidence that other individuals made allegations against Young for sexual abuse, Young is not likely to succeed in his claim against Israel for the publication of the Activist Abuse Website statements.

The motion to strike is GRANTED with respect to all claims based upon statements made on the Activist Abuse Website.

**C.**   **Young Has Not Presented Sufficient Facts to Support a Viable Claim of Defamation Against Defendant Lungarelli**

Defendant Lungarelli states in the Camille Email that she does not have personal knowledge of or experience with Young's alleged abusive behavior, but that she chose to believe the allegations of women who claimed to have been abused.  She declares that she is friends with Israel, and that she worked with Israel to institute the accountability process with Young.

Young fails to present sufficient evidence to support a finding that Lungarelli acted with actual malice.  Nor does Young present evidence that she was reckless in making allegations against him.  Defendant Lungarelli consulted with other members of the animal rights community, including, apparently, the individual identified as Camille, who did not believe that the allegations against Young were true.  As she stated in the Camille Email, Lungarelli "made a decision to believe and support survivors," admitted that she did not have personal knowledge of the allegations against Young, and recognized that others in the animal rights community had doubts about the allegations.

While Young could argue that Lungarelli was not certain that the allegations against Young were true, he submitted no evidence that would support a finding that she was aware of a high probability that the allegations were false, nor that she entertained serious doubts as to the truth of the allegations.  Young has produced no evidence of readily available facts ignored by Lungarelli, nor any other information that should have indicated to her that the allegations were false.  Young is not likely to prevail on a claim that Lungarelli acted with actual malice.  The special motion to strike is thus GRANTED with respect to all claims against Lungarelli.

**D.**   **Young's False Light Claim is Substantially Similar to the Defamation Claim**

A claim of false light is defined as follows:

> a species of invasion of privacy, based on publicity that places a
> plaintiff before the public in a false light that would be highly
> offensive to a reasonable person, and where the defendant knew
> or acted in reckless disregard as to the falsity of the publicized
> matter and the false light in which the plaintiff would be placed.

*Price v. Operating Eng'rs Local Union No. 3*, 195 Cal. App. 4th 962 (2011).

The First Amendment protections shielding speech from liability apply not only to claims of defamation but to "all claims whose gravamen is the alleged injurious falsehood of a statement." *Gilbert*, 147 Cal. App. 4th at 34.

Young, as discussed above, has failed to show a probability of prevailing on his claims against Lungarelli. He also has failed to present evidence that Israel acted with reckless disregard to the falsity of any statements she made regarding Young's alleged abuse of other women. The special motion to strike is thus granted with respect to these statements, and denied as to the remaining statements published by Israel, since Young has demonstrated a probability of prevailing on a claim of defamation based on those claims and a claim of defamation is substantially the same as a claim of false light. *Fellows v. Nat'l Enquirer, Inc.*, 42 Cal. 3d 234, 251 (1986) ("virtually every published defamation would support an action for false light invasion of privacy"); *Tamkin v. CBS Broad., Inc.*, 193 Cal. App. 4th 133, 149 (2011) (holding that a false light claim is "in substance equivalent" to a defamation claim) (internal citations omitted); *Eisenberg v. Alameda Newspapers, Inc.*, 74 Cal. App. 4th 1359, 1385 n.13 (1999) ("When a false light claim is coupled with a defamation claim, the false light claim is essentially superfluous, and stands or falls on whether it meets the same requirements as the defamation cause of action").

**E.**  **Young Has Not Introduced Sufficient Evidence to Support a Claim of Intentional Infliction of Emotional Distress Claim**

In order to prevail on his claim of intentional infliction of emotional distress, Young must show:  (1) "outrageous conduct" by Defendants, (2) the Defendants intended

1  to cause or recklessly disregarded the probability of causing emotional distress, (3) severe

2  emotional suffering, and (4) that Defendants' conduct was the actual and proximate cause

3  of his emotional distress.  *Wong v. Tai Jing*, 189 Cal. App. 4th 1354, 1376 (2010).

4      Defendants cannot be held liable for intentional infliction of emotional distress

5  based on "mere insults, indignities, threats, annoyances, petty oppressions, or other

6  trivialities."  *Hughes v. Pair*, 46 Cal. 4th 1035, 1051 (2009).  Young must also pass a

7  "high bar" to demonstrate that he has suffered severe emotional distress, which is defined

8  as emotional distress of "such substantial quality or enduring quality that no reasonable

9  [person] in civilized society should be expected to endure it."  *Id.* ("discomfort, worry,

10  anxiety, upset stomach, concern, and agitation" are not severe emotional distress)

11  (quoting *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 1004 (1993) (alteration in

12  original); *see also Wong*, 189 Cal. App. 4th at 1377 (lost sleep, upset stomach, and

13  general anxiety are not severe emotional distress).  Young must present evidence of

14  specific facts "demonstrating the nature, extent or duration of [his] alleged emotional

15  distress."  *Angie M. v. Superior Court*, 37 Cal. App. 4th 1217, 1227 (1995) (a minor

16  victim of sexual abuse failed to demonstrate severe emotional distress where she did not

17  allege specific facts about that distress).

18      Here, Young conclusorily attests that as a result of the allegations made against

19  him, his "emotional health worsened," his "romantic life suffered," he has "lost many

20  friends," and he is "deeply depressed and [his] reputation has been destroyed."  (Young

21  Decl. ¶ 55.)  He further alleges that he has been assaulted by individuals who believed

22  that he is a rapist, and is "frequently confronted and called a rapist and abuser."  (*Id.*)

23  Without any corroborating medical evidence, an assertion of "deep depression" and

24  "worsened emotional health" is no "more severe, lasting, or enduring than that shown" in

25  *Wong* and *Hughes*.  *Wong*, 189 Cal. App. 4th at 1377.  Young has presented no evidence

26  in opposition to this motion that would support a finding that he suffered from the type of

27  severe emotional distress that would sustain his claim.  Thus, the special motion to strike

28

is GRANTED with regard to Young's claim of intentional infliction of emotional distress.

## IV.

## CONCLUSION

In light of the foregoing:

1.  The special motion to strike the complaint against Israel is **DENIED** with respect to the Weissman, Friedman, and Lungarelli Emails to the extent they state or imply that Young physically, emotionally, and sexually abused Israel, raped her, put her health at risk, and abandoned her without any resources.

2.  The special motion to strike the complaint against Israel is **GRANTED** with respect to the allegations based upon the Community Alert Flyer, the Regan Email, the Camille Email, the Wikipedia Page, the YouTube Video, and the Activist Abuse Website.

3.  The special motion to strike the complaint against Defendant Lungarelli is **GRANTED** in its entirety.

4.  The special motion to strike is **GRANTED** as to Young's claim of intentional infliction of emotional distress.

**IT IS SO ORDERED**.

DATED:     September 16, 2011

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE