1                 UNITED STATES OF AMERICA

2                 UNITED STATES DISTRICT COURT

3                 CENTRAL DISTRICT OF CALIFORNIA

4                      CENTRAL DIVISION

5                          - - -
                   HONORABLE DOLLY M. GEE
6         UNITED STATES DISTRICT JUDGE PRESIDING
                           - - -
7

8    PETER YOUNG,                    )
                                     )
9              PLAINTIFF,            )
                                     )
10   VS.                            )   CV 11-01985-DMG
                                     )
11   HANNA ISRAEL,                   )
                                     )
12             DEFENDANT.            )
     _____)
13

14

15

                     *SCHEDULING CONFERENCE*
16
                   LOS ANGELES, CALIFORNIA
17
                      JUNE 20, 2011
18

19

20

21

22

23              ROSALYN ADAMS, CSR 11794
              FEDERAL OFFICIAL COURT REPORTER
24         312 NORTH SPRING STREET, ROOM 410
             LOS ANGELES, CALIFORNIA 90012
25                  (213) 894-2665


          UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

```
 1   APPEARANCES:

 2   ON BEHALF OF THE PLAINTIFF:

 3           LAW OFFICES OF JILL L. RYTHER
             BY:  JILL L. RYTHER
 4           6911 TOPANGA CANYON BOULEVARD
             SUITE 300
 5           CANOGA PARK, CALIFORNIA 91303
             (818) 347-4126
 6
             LAW OFFICES OF DAVID E. BURKE
 7           BY:  DAVID E. BURKE
             10982 ROEBLING AVENUE
 8           NUMBER 553
             LOS ANGELES, CALIFORNIA 90024
 9           (562) 746-5147

10   ON BEHALF OF DEFENDANT:

11           WASSERMAN COMDEN CASSELMAN & ESENSTEN, LLP
             BY:  RANDI R. GEFFNER
12           5567 RESEDA BOUELVARD
             SUITE 330
13           TARZANA, CALIFORNIA 91356
             (818) 705-6800
14
             WASSERMAN COMDEN CASSELMAN & ESENSTEN, LLP
15           BY:  KIRK S. COMER
             801 SOUTH GARFIELD AVENUE
16           SUITE 328
             ALHAMBRA, CALIFORNIA 91801
17           (626) 308-9882

18

19

20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT**

```
 1          LOS ANGELES, CALIFORNIA; MONDAY, JUNE 20, 2011; 9:30 A.M.

 2                             --oOo--

 3

 4

 5          THE CLERK:  ITEM TWO, CV 11-01985(DMG):  *PETER

 6   YOUNG V. HANNA ISRAEL YOUNG, ET AL.*

 7          COUNSEL, PLEASE STATE YOUR APPEARANCES.

 8          MS. RYTHER:  GOOD MORNING, YOUR HONOR.

 9          JILL RYTHER FOR THE PLAINTIFF, PETER YOUNG.

10          MR. YOUNG:  GOOD MORNING, YOUR HONOR.

11          DAVID EDWARD BURKE FOR THE PLAINTIFF, PETER YOUNG.

12          THE COURT:  ALL RIGHT.

13          WOULD YOU COME FORWARD TO THE COUNSEL TABLE,

14   PLEASE.

15          MR. COMER:  GOOD MORNING, YOUR HONOR.

16          KIRK COMER FOR DEFENDANT, LAURA LUNGARELLI, AND

17   DEFENDANT AND COUNTER-CLAIMANT, HANNA ISRAEL.

18          MS. GEFFNER:  GOOD MORNING, YOUR HONOR.

19          RANDI GEFFNER FOR DEFENDANT, LAURA LUNGARELLI, AND

20   DEFENDANT, HANNA ISRAEL, COUNTER-CLAIMANT.

21          THE COURT:  ALL RIGHT.  WHEN YOU SPEAK, PLEASE

22   SPEAK INTO ONE OF THE MICROPHONES.

23          ALL RIGHT.  THE COURT DOESN'T HAVE A TENTATIVE THIS

24   MORNING.  THERE HAVE BEEN A LOT OF FILINGS IN THIS CASE AFTER

25   THE DATE OF THE REPLY BRIEF, WHICH IS NOT USUALLY
```

1    PERMISSIBLE.  AS FAR AS THE MOTION TO STRIKE THE REPLY BRIEF,

2    THAT IS DENIED.  A NUMBER OF PRELIMINARY MATTERS WITH REGARD

3    TO THE DECLARATIONS THAT WERE FILED BY THE PLAINTIFFS, THE

4    INITIAL VERSION WERE NOT IN COMPLIANCE WITH 28, USC, SECTION

5    1746, THE SUBSEQUENT MODIFICATIONS TO THE AFFIRMATIONS WERE

6    ALSO DEFICIENT.

7            I'M NOT SURE IF YOU READ THEM OR NOT, BUT THEY

8    BASICALLY INDICATE THAT THE DECLARANTS ARE AFFIRMING UNDER

9    PENALTY OF PERJURY THAT THE PREVIOUS DECLARATIONS WERE SIGNED

10   UNDER PENALTY OF PERJURY, BUT THEY WEREN'T SIGNED UNDER

11   PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES.

12   GRAMMATICALLY THEY'RE JUST NOT CORRECT.  SO I UNDERSTAND WHAT

13   YOU'RE TRYING TO DO WITH THEM, BUT YOU'RE GOING TO NEED TO

14   SUBMIT PROPER DECLARATIONS IF THE COURT IS GOING TO CONSIDER

15   THEM AT ALL.  AND WHAT I WOULD SUGGEST IS THAT YOU REDO THE

16   DECLARATIONS SO THAT THE STATEMENTS THAT THEY ARE ATTESTING

17   TO ARE ABOVE THE AFFIRMATION.  IF YOU LOOK CLOSELY AT THE

18   AFFIRMATIONS THAT YOU SUBMITTED, GRAMMATICALLY THEY ARE

19   STRANGE.

20           MS. RYTHER:  OKAY.  I WILL DO THAT, YOUR HONOR.

21           THE COURT:  ALL RIGHT.  YOU WILL HAVE UNTIL

22   TOMORROW CLOSE OF BUSINESS TO SUBMIT THE DECLARATIONS WITH

23   PROPER AFFIRMATIONS.

24           MS. RYTHER:  OKAY.  THANK YOU.

25           THE COURT:  AND WHAT IS THE GOOD CAUSE FOR WHY I

1    SHOULD ACCEPT THE JORDAN JONES DECLARATION LATE?

2              MS. RYTHER:  I WASN'T ACTUALLY AWARE THAT THE

3    JORDAN JONES DECLARATION WASN'T FILED.  ORIGINALLY, I THINK

4    IF YOU LOOK AT THE -- YOU LOOK ON THE LINE THAT SAYS, "THE

5    DECLARATION OF JORDAN JONES WAS FILED," AND UNTIL I SAW THE

6    OPPOSITION STATING THAT THEY DIDN'T -- THAT WASN'T FILED, I

7    FILED IT IMMEDIATELY.  SO I DON'T KNOW WHY IT WASN'T FILED.

8    I CERTAINLY INTENDED TO FILE IT.  YOU SEE IT WAS DATED THE

9    SAME DATE AS THE OTHER ONES, BUT FOR SOME REASON IT DIDN'T

10   ACTUALLY ATTACH, SO I'M NOT SURE WHY.  BUT AS SOON AS I FOUND

11   OUT, I SUBMITTED IT RIGHT AWAY.

12             THE COURT:  ALL RIGHT.  AT THIS TIME, I'D LIKE TO

13   HAVE THE PARTIES FOCUS OR HONE IN ON NUMBER ONE, WHICH ARE

14   THE STATEMENTS THAT HANNA ISRAEL ACTUALLY MADE AND WHAT THE

15   EVIDENCE OF ACTUAL MALICE IS.  SO, PERHAPS, MS. RYTHER, YOU

16   SHOULD GO FIRST, AND I'D ASK THAT YOU GO TO THE LECTERN.

17             MS. RYTHER:  YOUR HONOR, MAY MY CO-COUNSEL, DAVID

18   BURKE, HANDLE THAT QUESTION?  HE ACTUALLY FOCUSED ON THAT

19   ONE.

20             THE COURT:  ALL RIGHT.  THANK YOU.

21             MS. RYTHER:  THANK YOU.

22             MR. BURKE:  SO, YOUR HONOR, THE FIRST QUESTION YOU

23   ASKED WAS WHAT ARE THE STATEMENTS MADE BY DEFENDANT ISRAEL;

24   IS THAT CORRECT?

25             THE COURT:  THAT YOU'RE CLAIMING ARE ACTIONABLE.

1    THERE ARE A LOT OF STATEMENTS BEING MADE ON WEBSITES AND IN

2    LISTSERVS AND E-MAILS, BUT IT SEEMS TO ME THAT THERE ARE

3    REALLY VERY FEW STATEMENTS THAT YOU CAN SHOW WERE ACTUALLY

4    MADE BY HANNA ISRAEL.

5         MR. BURKE:  WELL, FIRST, IN THE JORDAN JONES

6    DECLARATION, ISRAEL TOLD JONES OR JONES STATED THAT ISRAEL

7    TOLD JONES THAT PLAINTIFF HAD STARVED AND PHYSICALLY ABUSED

8    HER.  ISRAEL ALSO TOLD JORDAN JONES THAT PLAINTIFF HAD

9    SEXUALLY AND MENTALLY ABUSED HER.

10         IN THE MATT BRUCE DECLARATION, BRUCE MAKES SIMILAR

11   STATEMENTS ABOUT WHAT ISRAEL TOLD HIM.  ISRAEL TOLD MATT

12   BRUCE ON JANUARY 7, 2010, THAT PLAINTIFF STARVED HER AND THAT

13   SHE HAD TO GO TO THE HOSPITAL AS A RESULT AND THAT SHE ALMOST

14   DIED AS A RESULT OF PLAINTIFF'S ACTIONS.

15         EXHIBIT B THAT WE HAVE ATTACHED TO THE DECLARATION

16   OF PETER YOUNG IS AN E-MAIL WRITTEN BY ISRAEL STATING THAT

17   PLAINTIFF SEXUALLY ASSAULTED MULTIPLE WOMEN.

18         EXHIBIT F --

19         THE COURT:  E-MAIL TO LAUREN REAGAN.

20         MR. BURKE:  EXHIBIT B IS A -- IT'S NOT CLEAR WHO

21   THE E-MAIL WAS WRITTEN TO BASED ON THE EXHIBIT, BUT IT'S

22   CLEAR THAT IT WAS WRITTEN BY DEFENDANT ISRAEL.

23         THE COURT:  WELL, HOW IS THAT A PUBLICATION IF YOU

24   CAN'T SHOW WHO IT WAS WRITTEN TO OR WHERE IT SHOWED UP?

25         MR. BURKE:  WELL, IT DID SHOW UP ONLINE, THAT'S HOW

1    THE E-MAIL WAS OBTAINED, SO IT WAS PUBLICIZED ONLINE.

2            THE COURT:  RIGHT.

3            BUT BY ISRAEL?

4            MR. BURKE:  WELL, THE E-MAIL WAS WRITTEN FROM HER

5    ADDRESS, SO LOGICALLY SHE WROTE IT TO SOMEONE.  NOW, AT THIS

6    STAGE PRE-COMPLETION OF DISCOVERY, WE'RE NOT A HUNDRED

7    PERCENT SURE WHO THAT E-MAIL WAS WRITTEN TO, BUT WE KNOW THAT

8    SHE WROTE IT AND WE KNOW THAT IT APPEARED ONLINE.

9            THE COURT:  WELL, ON ANTI-SLAPP MOTION, YOU HAVE TO

10   BRING ALL OF YOUR BEST EVIDENCE FORWARD AT THIS POINT.  DON'T

11   YOU HAVE TO SHOW BY CLEAR AND CONVINCING EVIDENCE THAT YOU'RE

12   LIKELY TO BE ABLE TO SHOW ACTUAL MALICE?

13           MR. BURKE:  I -- NO, I DON'T BELIEVE THAT'S

14   CORRECT.  THAT'S THE SECOND PRONG OF THE ANALYSIS.

15           THE COURT:  WELL, ACTUALLY, THE FIRST PRONG OF IT

16   HAS TO DO WITH WHETHER OR NOT THIS WAS A PUBLIC DISCOURSE.

17           MR. BURKE:  YES.

18           THE COURT:  AND IN SOME WAYS THE EVIDENCE THAT YOU

19   PRESENTED SUPPORTS THAT IT WAS A PUBLIC DISCOURSE INSOFAR AS

20   YOU PROVIDE STATEMENTS THAT WERE MADE BY VARIOUS PEOPLE IN A

21   WEBSITE FOR A GROUP CALLED "ACCOUNTABILITY NOW."

22           IN THE CONTEXT OF THOSE STATEMENTS IN THAT WEBSITE,

23   HOW CAN THAT NOT BE PUBLIC DISCOURSE ABOUT ACCOUNTABILITY OF

24   AN ALLEGED LEADER OF AN ANIMAL RIGHTS MOVEMENT WHEN THEY TIE

25   IT INTO THE QUESTION OF WHETHER THERE'S A DOUBLE STANDARD

1  APPLIED, SO TO SPEAK, BY THAT SAME PERSON WITH RESPECT TO

2  HUMANS?

3          MR. BURKE:  WELL, I'M NOT SURE WHAT IS IT THAT'S

4  LEADING YOU TO BELIEVE IT'S A PART OF PUBLIC DISCOURSE.  IS

5  IT THE FACT THAT IT WAS PUBLISHED ONLINE, OR IS IT THE FACT

6  THAT --

7          THE COURT:  YOU DON'T THINK THAT TALKING ABOUT

8  ACCOUNTABILITY OF LEADERS OF A MOVEMENT IS NECESSARILY PART

9  OF PUBLIC DISCOURSE?

10          MR. BURKE:  NO, NOT NECESSARILY.  IT WOULD DEPEND

11  ON THE SIZE OF THE MOVEMENT AND THE TYPE OF DISCOURSE, I

12  BELIEVE.  AND, IN THIS CASE, THE ACCUSATIONS ON THE WEBSITE

13  WERE DIRECTED AGAINST AN INDIVIDUAL PERSON.  THERE WASN'T AN

14  ONGOING CONTROVERSY OR DISCOURSE THAT THESE ACCUSATIONS

15  CONTRIBUTED TO.  THESE ACCUSATIONS CONSISTED OF THE DISCOURSE

16  IN IT'S ENTIRETY.  THEY CREATED THE DISCOURSE, SO I DON'T

17  THINK THAT THE DEFENDANTS CAN HIDE BEHIND THE NOTION THAT

18  THIS IS PUBLIC DISCOURSE BECAUSE THEY CLAIM IT IS.  THERE WAS

19  NO ONGOING CONTROVERSY.

20          THE COURT:  SO YOU'RE DENYING THAT THERE'S ONGOING

21  ACCOUNTABILITY CONCERNS WITHIN THE MOVEMENT?  THIS IS THE

22  FIRST TIME THAT ANY LEADER OR ALLEGED LEADER OF A MOVEMENT

23  HAD EVER BEEN CALLED TO THE MAT, SO TO SPEAK, ABOUT THEIR

24  CONDUCT?

25          MR. BURKE:  WELL, IT'S DEFENDANT'S BURDEN TO

1    ESTABLISH THAT THERE WAS SUCH A CONTROVERSY, AND I HAVEN'T

2    SEEN ANY EVIDENCE IN THE RECORD ESTABLISHING THAT THE WEBSITE

3    AND THE ACCUSATIONS WERE A PART OF A LARGER ISSUE THAT

4    PERVADED THE ANIMAL RIGHTS COMMUNITY OR A LARGER COMMUNITY.

5    SO, NO, I WOULDN'T CONCEDE THAT THEY WERE A PART OF ANY

6    SIGNIFICANT PUBLIC DISCOURSE.

7            THE COURT:  SO YOU'RE SAYING THIS ACCOUNTABILITY

8    PROCESS STARTED AS A RESULT OF THIS.  IT DIDN'T EXIST BEFORE?

9            MR. BURKE:  THE ACCOUNTABILITY PROCESS WAS CREATED

10   BY THE DEFENDANTS.  IF YOU LOOK AT THE DECLARATION OF HANNAH

11   ISRAEL, WHICH WAS FILED IN REPLY TO OUR OPPOSITION, SHE

12   DESCRIBES THE ACCOUNTABILITY PROCESS.  IT'S AN INTERNAL

13   MECHANISM OF RESOLVING DISPUTES IN THE ANIMAL RIGHTS

14   COMMUNITY.  THIS WAS A --

15           THE COURT:  RIGHT.

16           THAT'S MY QUESTION.  IS THAT SOMETHING THAT EXISTED

17   PRIOR TO THIS DISPUTE BETWEEN YOUNG AND ISRAEL?

18           MR. BURKE:  I BELIEVE THE ACCOUNTABILITY PROCESS

19   EXISTED, BUT I DON'T BELIEVE THAT THERE WAS AN ONGOING

20   CONTROVERSY REGARDING THE TREATMENT OF ANIMAL ACTIVISTS AND

21   WOMEN THAT THIS CONTROVERSY WAS A PART OF.

22           THE COURT:  WHAT WAS THE -- DO YOU KNOW WHAT THE

23   CONTEXT OF THE ACCOUNTABILITY DISCOURSE WAS PRIOR TO THIS

24   PARTICULAR DISPUTE ARISING ?

25           MR. BURKE:  NO.  NO, I DON'T.

1          AND, FURTHERMORE, THE ALLEGATIONS ON THE WEBSITE

2     ARE A SMALL FRACTION OF THE ACCUSATIONS MADE BY DEFENDANT AND

3     THE MAJORITY OF THE ALLEGATIONS MADE BY DEFENDANTS ABOUT

4     PLAINTIFF WERE MADE PRIVATELY.  MANY OF THEM WERE MADE IN

5     ONE-ON-ONE CONVERSATIONS.  SO TO CONTEND THAT, YOU KNOW, A

6     CONVERSATION BETWEEN ONE INDIVIDUAL AND ANOTHER INDIVIDUAL OR

7     AN E-MAIL WRITTEN BY ONE PERSON TO ANOTHER MAKING ACCUSATIONS

8     ABOUT THE PLAINTIFF TO CONTEND THAT THAT'S PART OF PUBLIC

9     DISCOURSE, IT'S DIFFICULT TO IMAGINE WHAT WOULDN'T BE A PART

10    OF PUBLIC DISCOURSE IF PRIVATE CONVERSATIONS AND PRIVATE

11    E-MAILS ARE NOW CONSIDERED PUBLIC DISCOURSE.

12          THE COURT:  DO YOU HAVE TO SHOW THAT THESE PRIVATE

13    E-MAILS WERE, IN FACT, PUBLISHED BY THE DEFENDANTS ON THE

14    WEBSITES AND IN THE LISTERS THAT YOU SAY THEY WERE PUBLISHED

15    IN?

16          MR. BURKE:  NO, I DON'T BELIEVE WE HAVE TO SHOW --

17    WE HAVE TO SHOW AN INITIAL PUBLICATION, BUT THE DEFENDANTS

18    CAN ALSO BE LIABLE FOR THE REPUBLICATION OF THE STATEMENTS.

19    SO AS LONG AS -- IT'S NOT OUR BURDEN TO SHOW THAT EVERY

20    ACCUSATION WAS PUBLISHED ONLINE.  IT'S OUR BURDEN TO SHOW

21    THAT PUBLICATION OCCURRED, AND PURSUANT TO CALIFORNIA CASE

22    LAW, PUBLICATION OCCURS WHEN A DEFENDANT TELLS A SINGLE

23    PERSON ABOUT AN ACCUSATION OR SENDS A SUBTLE E-MAIL.  SO IT'S

24    NOT OUR BURDEN TO ESTABLISH THAT EVERY ACCUSATION WAS

25    ULTIMATELY PUBLISHED ONLINE AT THE DEFENDANT'S BEHEST.

```
 1              THE COURT:  SO WHAT EVIDENCE DO YOU HAVE TO SHOW

 2    THAT THERE WAS ACTUAL MALICE ON THE PART OF LUNGARELLI, FOR

 3    EXAMPLE?

 4              MR. BURKE:  WELL, THERE IS NO EVIDENCE THAT

 5    LUNGARELLI ATTEMPTED TO VERIFY ANY OF THE STATEMENTS THAT SHE

 6    MADE.  SHE -- FROM HER OWN DECLARATION FILED IN REPLY, SHE

 7    ACKNOWLEDGES THAT WHAT SHE WAS DOING WAS PASSING ON

 8    ACCUSATIONS SHE HAD HEARD PREVIOUSLY.  SHE HEARD THAT

 9    DEFENDANT ISRAEL HAD ACCUSED PLAINTIFF OF SEXUAL ASSAULT.

10    SHE ALSO HEARD FROM A PERSON WHO HEARD FROM A WOMAN NAMED

11    ASHLEY STROBELT THAT PLAINTIFF HAD BEEN ACCUSED OF SEXUAL

12    ASSAULT.  ISRAEL THEN PASSED THOSE ALLEGATIONS ONTO DEFENDANT

13    ADAM WEISSMAN WITHOUT VERIFYING THEM IN ANY WAY.  SO IN THE

14    SAME WAY THAT A JOURNALIST WOULD BE CONSIDERED TO RECKLESSLY

15    DISREGARD FACTS IF HE DIDN'T CHECK THEM, I THINK LUNGARELLI

16    CAN BE FOUND TO HAVE SHOWN ACTUAL MALICE BY RECKLESSLY

17    DISREGARDING FACTS BY FAILING TO VERIFY THE ACCUSATIONS MADE

18    AGAINST PLAINTIFF BEFORE PASSING THEM ON TO A THIRD PARTY.

19              THE COURT:  WELL, DID SHE SAY THAT THERE HAD BEEN

20    ACCUSATIONS MADE, OR THAT HE HAD, IN FACT, ASSAULTED OTHER

21    WOMEN IN THE PAST?

22              MR. BURKE:  SHE SAID THAT THERE HAD BEEN

23    ACCUSATIONS MADE.  ACCORDING TO A CASE I FOUND, I CAN GO

24    THROUGH IT IF YOU LIKE.

25              THE COURT:  IS IT A CASE CITED IN YOUR PAPERS?
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

1      MR. BURKE:  NO.  I FOUND THIS CASE AFTER READING

2  DEFENDANT'S LUNGARELLI'S DECLARATION OR RESPONSE.  IT WASN'T

3  SUBMITTED THE FIRST TIME AROUND.

4      THE COURT:  ALL RIGHT.  WHAT'S THE CASE CITATION?

5      MR. BURKE:  I BELIEVE IT IS *GILLMAN V. METCASH*

6  *(PHONETIC)*.  IT'S 111 C.606.  IT'S A VERY OLD CASE, BUT THE

7  GIST OF THE CASE IS THAT IF "A" SAYS THAT "B" IS A THIEF, AND

8  THEN "C" PASSES ON THE STATEMENT "A" SAID "B" IS A THIEF, "C"

9  ISN'T OFF THE HOOK.  IN A SENSE, WHAT "C" SAID IS TRUE.  "A"

10  DID ACCUSE "B" OF BEING A THIEF, BUT "C'S" DEFENSE WOULD

11  CONSIST IN ACTUALLY SHOWING THAT "B" IS A THIEF.  "C" CAN'T

12  SIMPLY PASS ON ACCUSATIONS MADE AND GET AWAY WITH IT BY

13  SAYING THESE ARE ONLY ACCUSATIONS.

14      THE COURT:  WELL, IN *GILMAN* WAS IT THAT THERE WERE

15  ACCUSATIONS THAT SOMEBODY WAS A THIEF, OR DID THEY SAY SO AND

16  SO IS A THIEF?

17      MR. BURKE:  IT WOULD BE THE LUNGARELLI PERSON WOULD

18  HAVE SAID ISRAEL CLAIMED PLAINTIFF COMMITTED SEXUAL ASSAULT.

19  AND ACCORDING TO MY READING OF GILMAN, LUNGARELLI WOULD HAVE

20  TO PROVE THAT PLAINTIFF HAD ACTUALLY COMMITTED SEXUAL

21  ASSAULT.  IT'S NOT A DEFENSE TO JUST SAY, WELL, ISRAEL

22  CLAIMED HE COMMITTED SEXUAL ASSAULT.  ACCORDING TO *GILMAN*,

23  SHE HAS TO PROVE THAT THE ASSAULT ACTUALLY OCCURRED EVEN IF

24  SHE COUCHES IT AND THIS IS ONLY AN ACCUSATION THAT WAS MADE.

25      THE COURT:  ALL RIGHT.  WHAT DO YOU SAY TO THE

| | |
|---|---|
| 1 | DEFENDANT'S CONTENTION THAT MANY OF THESE STATEMENTS ARE |
| 2 | STATEMENTS OF OPINION RATHER THAN FACT? |
| 3 | MR. BURKE:  I THOUGHT THE CONTENTION WAS LUDICROUS, |
| 4 | TO BE HONEST WITH YOU.  IF YOU LOOK AT SOME OF THE SPECIFIC |
| 5 | ACCUSATIONS PLAINTIFF SEXUALLY ASSAULTED MULTIPLE WOMEN, |
| 6 | THAT'S NOT A MATTER OF OPINION.  WHETHER SEXUAL ASSAULT |
| 7 | OCCURRED IS AN ISSUE OF LAW.  SEXUAL ASSAULT IS A CRIME AND |
| 8 | IT EITHER OCCURRED OR IT DIDN'T.  AND ISRAEL MAY THINK WHAT |
| 9 | HAPPENED TO HER WAS SEXUAL ASSAULT OR MAY THINK IT WASN'T, |
| 10 | BUT THE DEFINITE ISSUE OF WHETHER SEXUAL ASSAULT OCCURRED IS |
| 11 | AN ISSUE OF FACT, NOT OF OPINION. |
| 12 | FURTHERMORE, THERE'S THE ALLEGATIONS THAT PLAINTIFF |
| 13 | STARVED AND PHYSICALLY ABUSED ISRAEL.  AGAIN, THESE ARE |
| 14 | WELL-DEFINED TERMS THAT CAN BE FACTUALLY DETERMINED.  A |
| 15 | MEDICAL PHYSICIAN COULD DETERMINE IF A PERSON STARVED TO |
| 16 | DEATH.  IT'S -- YOU KNOW, IT'S A WAY THAT SOMEONE CAN PERISH. |
| 17 | AND FOR ISRAEL TO LIGHTLY ACCUSE PLAINTIFF OF STARVING HER TO |
| 18 | THE POINT OF NEAR DEATH, I BELIEVE THAT'S AN ISSUE OF FACT |
| 19 | AND NOT OF OPINION. |
| 20 | THE COURT:  WAS THERE A STATEMENT SOMEWHERE |
| 21 | PUBLISHED BY ISRAEL THAT SHE WAS STARVED UNTIL SHE WAS NEAR |
| 22 | DEATH? |
| 23 | MR. BURKE:  THERE WERE AT LEAST ONE, I BELIEVE TWO. |
| 24 | I'M GOING TO GRAB THE DECLARATION OF MATT BRUCE. |
| 25 | THE COURT:  WELL, THAT WAS A SUPPOSED MEDIATION, |

```
 1   WASN'T IT?
 2              MR. BURKE:  YES, IT WAS.
 3              THE COURT:  HOW DID IT COME ABOUT THAT PETER
 4   YOUNG'S GOOD FRIEND BECAME THE MEDIATOR IN THIS SITUATION AND
 5   NOW HE'S SUBMITTING A DECLARATION?  I PRESUME THIS WAS NOT A
 6   FORMAL MEDIATION.
 7              MR. BURKE:  I DON'T KNOW.  MOST MY UNDERSTANDING OF
 8   THE MEDIATION CAME, AGAIN, FROM ISRAEL'S RESPONSE IN THE
 9   REPLY DECLARATION, BUT -- SO I DON'T KNOW HOW IT CAME ABOUT.
10   I ASSUME THAT PLAINTIFF KNEW ISRAEL -- PLAINTIFF KNEW MATT
11   BRUCE AND SUGGESTED HIM AS A MEDIATOR AND THAT'S WHERE ISRAEL
12   MADE THE STATEMENTS.  I'M NOT SURE WHY IT MATTERS HOW THE
13   MEDIATION WAS ARRANGED.
14              THE COURT:  WELL, IT MATTERS IF THIS WAS A FORMAL
15   MEDIATION.  OBVIOUSLY A REAL MEDIATOR PROBABLY WOULD NOT HAVE
16   BEEN IN A POSITION OF SUBMITTING A DECLARATION ABOUT WHAT
17   HAPPENED DURING THE MEDIATION.
18              MR. BURKE:  OH, OKAY.  I SEE YOUR CONCERN.
19              WELL, I CAN ASSURE YOU I'M ALMOST CERTAIN THAT THIS
20   WAS NOT A REAL MEDIATION AND THIS WAS SIMPLY, AS YOU ALLUDED
21   TO EARLIER IN THE ANIMAL RIGHTS COMMUNITY PEOPLE TEND TO TRY
22   AND RESOLVE DISPUTES INTERNALLY, AND THIS WAS AN INFORMAL
23   PROCESS.
24              THE COURT:  ALL RIGHT.
25              MR. BURKE:  SO IN MATT BRUCE'S DECLARATION, ISRAEL
```

1    STATED THAT SHE HAD BEEN STARVED FOR 21 DAYS, AND IN

2    PARAGRAPH 12 OF HER DECLARATION, SHE STATED THAT PLAINTIFF

3    REFUSED TO TAKE HER TO THE HOSPITAL WHEN SHE HAD A MEDICAL

4    CONDITION AND THAT SHE ALMOST DIED.

5            AGAIN, THIS IS A VERIFIABLE FACT THAT A

6    DOCTOR COULD ASCERTAIN WHETHER A PERSON IS NEAR DEATH OR NOT.

7            THE COURT:  ALL RIGHT.  BUT THAT WAS A CONVERSATION

8    IN PRIVATE WITH PETER YOUNG AND BRUCE, MATT BRUCE, CORRECT?

9            MR. BURKE:  YES, IT WAS.

10           THE COURT:  SO THIS WAS NOT SOMETHING THAT WAS

11   PUBLISHED TO ANYONE.

12           MR. BURKE:  WELL, AGAIN, BY THE STANDARDS OF

13   CALIFORNIA LAW, PUBLICATION IS A CONVERSATION.  SO WHEN

14   ISRAEL MADE THAT STATEMENT TO MATT BRUCE, THAT CONSTITUTES

15   PUBLICATION.  SHE ALSO MADE COMPARABLE STATEMENTS TO JORDAN

16   JONES WHEN PLAINTIFF WASN'T THERE.

17           THE COURT:  YEAH.

18           BUT THESE ARE STATEMENTS THAT WOULD NOT LIKELY HAVE

19   BEEN REPUBLISHED BY MATT BRUCE OR JORDAN JONES, RIGHT?  SO

20   HOW WOULD YOU -- HOW DOES YOUR CLIENT GET DAMAGED THOSE

21   STATEMENTS WHEN THESE ARE STATEMENTS MADE TO PETER YOUNG'S

22   GOOD FRIENDS?

23           MR. BURKE:  WELL, IF YOU WANT TO LOOK CAUSALLY HOW

24   HE GOT DAMAGED BY THOSE SPECIFIC STATEMENTS, I'M NOT SURE

25   THAT WE COULD TRACE THE DAMAGES SOLELY TRACING FROM JORDAN

1    JONES AND MATT BRUCE.  BUT WHEN YOU STEP MAKE AND YOU LOOK AT

2    THE STATEMENTS THAT WERE ALSO MADE TO ADAM WEISSMAN WHO ENDED

3    UP DISTRIBUTING FLYERS, STATEMENTS THAT WERE ALSO MADE TO

4    LAUREN REGAN, AND YOU GET A SENSE THAT ISRAEL TOLD BRUCE AND

5    JONES THAT SHE WAS SETTING OUT TO RUIN PLAINTIFF'S

6    REPUTATION, IT'S CLEAR THAT SHE WAS AFFIRMATIVELY TRYING TO

7    SPREAD THESE ACCUSATIONS AS FAR AND WIDE AS SHE COULD.  AND

8    EVENTUALLY THROUGH PLAINTIFF'S DECLARATION, YOU SEE THE

9    DAMAGES COME BACK TO HAUNT HIM AS HE'S CONFRONTED PUBLICLY BY

10   PEOPLE.

11          THE COURT:  ALL RIGHT.  WELL, I GUESS THE PROBLEM I

12   HAVE WITH THIS IS THAT THERE'S A CONFLATION OF ALL THESE

13   STATEMENTS WITHOUT A REAL ANALYSIS OF WHO'S SAYING WHAT AND

14   WHAT IS BEING ACTUALLY PUBLISHED.  YOU KNOW, I DON'T WANT TO

15   RELY ON STATEMENTS THAT WERE MADE TO JORDAN JONES AND MATT

16   BRUCE BECAUSE THOSE WERE TO PETER YOUNG'S GOOD FRIENDS.  IF

17   YOU LOOK AT STATEMENTS THAT WERE ONLY MADE TO PEOPLE THAT

18   WOULD HAVE REPUBLISHED THEM, THEN WE'RE NOT, I DON'T THINK,

19   TALKING ABOUT STATEMENTS AS CLEAR AS THE ONES THAT YOU'RE

20   REFERRING TO THAT WERE MADE TO EITHER JORDAN JONES OR TO MATT

21   BRUCE.

22          MR. BURKE:  WELL, I WOULD THEN LOOK AT THE

23   DECLARATION THAT ISRAEL HERSELF SUBMITTED IN RESPONSE -- IN

24   THE REPLY IN WHICH AT SOME POINT SHE ADMITTED TO TELLING ADAM

25   WEISSMAN THAT -- ABOUT THE ACCUSATION THAT SHE WAS MAKING

```
1    AGAINST PLAINTIFF.

2              THE COURT:  AND THAT ESSENTIALLY SHOWS UP IN THE

3    FLYER, RIGHT?

4              MR. BURKE:  YES.

5              AND DEFENDANT ISRAEL STATES THAT SHE WAS AWARE

6    WEISSMAN WAS PREPARING A FLYER ABOUT PLAINTIFF.  SO NOT ONLY

7    DID SHE MAKE THE STATEMENTS TO WEISSMAN, BUT SHE HAD A GOOD

8    SENSE THAT THEY WERE GOING TO BE DISTRIBUTED WELL BEYOND HER

9    INITIAL CONVERSATION WITH HIM.

10             THE COURT:  ALL RIGHT.  THANK YOU.

11             DO YOU HAVE ANYTHING ELSE YOU WISH TO ADD THAT

12   HASN'T BEEN RAISED IN YOUR PAPERS?

13             MR. BURKE:  I SUPPOSE NOTHING THAT HASN'T BEEN

14   RAISED IN MY PAPERS.  I WOULD LIKE TO GET TO THE ISSUE OF

15   WHETHER DEFENDANTS ADMIT THEIR INITIAL BURDEN OF SHOWING THAT

16   THE SPEECH WAS IN THE PUBLIC INTEREST, BECAUSE I SINCERELY DO

17   NOT THINK THEY HAVE.  BUT IF YOU DON'T WANT TO GET INTO THAT

18   AT THIS TIME, I'LL --

19             THE COURT:  GIVE IT YOUR BEST SHOT.

20             MR. BURKE:  OKAY.  WELL, I WANT TO REITERATE THAT

21   IT'S THE DEFENDANT'S INITIAL BURDEN AND THAT THERE ARE A

22   COUPLE OF STEPS THEY HAVE TO MEET.  FIRST, THEY HAVE TO SHOW

23   THAT THE STATEMENT OR WRITING WAS MADE IN A PLACE OPEN TO THE

24   PUBLIC OR IN A PUBLIC FORUM; AND, SECOND, THAT IT'S IN

25   CONNECTION WITH AN ISSUE OF PUBLIC INTEREST.
```

1        I'D LIKE TO START WITH THE PUBLIC INTEREST ASPECT.

2    THE DEFENDANT'S CONTEND THAT THE STATEMENTS WERE IN THE

3    PUBLIC INTEREST BECAUSE PLAINTIFF IS A PUBLIC FIGURE, AND I

4    THINK THAT'S ABSOLUTELY INCORRECT.

5        THE COURT:  DO YOU ADMIT THAT HE'S AT LEAST A

6    LIMITED PUBLIC FIGURE?

7        MR. BURKE:  NO, HE'S NOT A LIMITED PUBLIC FIGURE

8    FOR THE PURPOSES OF THIS CASE, BECAUSE THE ALLEGEDLY

9    DEFAMATORY STATEMENTS ARE NOT GERMANE TO THE REASON THE

10   PLAINTIFF IS KNOWN IN THE LIMITED FORUM.

11       I CITED THE *SYKES* CASE IN MY OPPOSITION AND I

12   BELIEVE THAT'S THE PERFECT EXAMPLE OF WHAT A LIMITED PUBLIC

13   FIGURE IS.  A PLASTIC SURGEON ADVOCATED THE BENEFITS OF

14   PLASTIC SURGERY ON TELEVISION AND IN ARTICLES.  A FORMER

15   PATIENT OF HIS THOUGHT SHE HAD BEEN TREATED VERY POORLY BY

16   THE SURGEON.  SHE MADE STATEMENTS ABOUT THE SURGEON'S

17   PRACTICE CRITICIZING HIS PLASTIC SURGERY AND HIS ABILITIES.

18   THE COURT CONCLUDED THAT BECAUSE THE STATEMENTS WERE GERMANE

19   TO THE REASON THE SURGEON WAS KNOWN PUBLICLY, HIS PLASTIC

20   SURGERY ADVOCACY, THAT THE SURGEON WAS A LIMITED PUBLIC

21   FIGURE.

22       IN THIS CASE, THE ALLEGEDLY DEFAMATORY STATEMENTS

23   ARE NOT REMOTELY GERMANE TO THE REASON THE PLAINTIFF IS

24   KNOWN.  PLAINTIFF IS AN ANIMAL RIGHTS ADVOCATE.  HE'S MOST

25   KNOWN FOR FREEING ANIMALS FROM FUR FARMS AND FOR SPEAKING

```
1     ABOUT HIS EXPERIENCES.  THESE ACCUSATIONS ARE PETTY PRIVATE

2     ACCUSATIONS ABOUT A RELATIONSHIP THAT PLAINTIFF HAD WITH HIS

3     EX-GIRLFRIEND.  SHE COMPLAINS ABOUT HE TREATED HER, AND

4     PLAINTIFF ISN'T KNOWN FOR SPEAKING OUT ABOUT TREATMENT OF

5     WOMEN.  HE'S KNOWN FOR SPEAKING OUT ABOUT ANIMAL ISSUES.

6          THE COURT:  YOU DON'T THINK THAT THIS ISSUE OF --

7     HIS TREATMENT OF ANIMALS AS JUXTAPOSED WITH HIS TREATMENT OF

8     HUMANS WOULD BE RELEVANT DISCOURSE?

9          MR. BURKE:  I THINK IT'S A -- I TRIED TO THINK OF A

10    LOGICAL COUNTERPOINT AND FOLLOWING THAT LOGIC IF A WOMAN

11    SPEAKS OUT AGAINST DOMESTIC VIOLENCE, IT'S ALSO RELEVANT IF

12    SHE WEARS A FUR COAT AND HOW OFTEN SHE FEEDS HER PETS.  IF

13    YOU WANT TO TAKE IT THAT FAR THAT SOMEONE WHO ADVOCATES FOR

14    ANIMALS ALSO ADVOCATES FOR HUMANS BECAUSE THEY'RE ALL PART

15    OF, YOU KNOW, INHABITANTS OF THE PLANET EARTH, YOU CAN MAKE

16    THAT TENUOUS CONNECTION.  BUT I THINK IT'S VERY TENUOUS AND I

17    DON'T THINK THERE'S ANY EVIDENCE ON THE RECORD THAT PLAINTIFF

18    HAS ADVOCATED FOR SPECIAL -- NOT EVEN SPECIAL, BUT

19    APPROPRIATE TREATMENT OF WOMEN.  AND THE ARGUMENT THAT HUMANS

20    AND ANIMALS ARE ONE TYPE OF -- YOU KNOW, THEY'RE ALL UNDER

21    THE UMBRELLA OF ANIMALS, THAT ARGUMENT WAS MADE FOR THE FIRST

22    TIME IN THE REPLY AND THERE'S NO EVIDENCE TO SUPPORT IT.

23    DEFENDANT SIMPLY DELIVERED A FEW PARAGRAPHS WHICH WERE THEIR

24    IDEA OF WHAT THE ANIMAL RIGHTS MOVEMENT IS.

25          WHERE DID THAT IDEA COME FROM?  WHY SHOULD WE
```

```
 1    ACCEPT DEFENDANT'S INTERPRETATION THAT THE ANIMAL RIGHTS
 2    MOVEMENT IS ABOUT TREATING ALL SPECIES EQUALLY?
 3              THERE'S NO EVIDENCE TO SUPPORT THAT.  AND IF YOU
 4    LOOK AT WHAT PLAINTIFF IS KNOWN FOR, IT HAS NOTHING TO DO
 5    WITH HIS INTERACTIONS WITH WOMEN.
 6              THE COURT:  SO YOU DON'T THINK THAT THERE'S ANY
 7    IRONY?
 8              MR. BURKE:  IT MAY BE IRONIC, BUT THAT'S NOT THE
 9    STANDARD THAT THE LAW REQUIRES.
10              THE COURT:  WELL, IN TERMS OF PUBLIC DISCOURSE, IF
11    YOU'RE TALKING ABOUT SOMEBODY WHO ADVOCATES FOR GOOD HUMANE
12    TREATMENT OF ANIMALS, YOU DON'T THINK THAT IT WOULD BE VALID
13    PUBLIC DISCOURSE TO SAY THAT THE PERSON HAS A DOUBLE STANDARD
14    WHEN IT COMES TO THE HUMAN SPECIES?
15              MR. BURKE:  IN THIS CASE IN WHICH IT'S
16    ESSENTIALLY -- IT WOULD MAKE ANY -- ANYONE WHO ADVOCATES FOR
17    THE RIGHTS OF ANY SPECIES' PERSONAL LIFE FAIR GAME FOR PUBLIC
18    DISCOURSE, NO, I DON'T THINK THAT'S CORRECT.  I THINK THAT
19    THE STANDARD IS STRICT.
20              THE PLASTIC SURGEON WAS A LIMITED PUBLIC FIGURE
21    WITH REGARDS TO HIS SURGICAL PRACTICE AND PLAINTIFF -- IF
22    PLAINTIFF HAD BEEN SEEN EATING MEAT OR WEARING A FUR COAT,
23    THOSE STATEMENTS WOULD BE GERMANE, BUT I THINK THE STANDARD
24    IS A LOT NARROWER THAN THE TENUOUS CONNECTION THAT THE
25    DEFENDANTS ADVOCATE.
```

```
1                    THE COURT:  I UNDERSTAND.

2                    ALL RIGHT.  THANK YOU.

3                    MR. BURKE:  IF I MAY MAKE ONE LAST POINT.  EVEN IF

4       YOU ACCEPT THAT PLAINTIFF IS A PUBLIC FIGURE, THE STATEMENTS

5       STILL NEEDED TO BE MADE IN A PUBLIC FORUM.  AND AS I

6       MENTIONED, I DON'T BELIEVE THE MAJORITY ARE.  MANY OF THEM

7       WERE MADE IN PRIVATE CONVERSATIONS, AND THEREFORE EVEN

8       ASSUMING PLAINTIFF IS A PUBLIC FIGURE, DEFENDANTS STILL CAN'T

9       MEET THEIR BURDEN OF SHOWING THAT THE STATEMENTS WERE MADE IN

10      A PUBLIC FORUM.

11                   THE COURT:  ALL RIGHT.  THANKS.

12                   MR. -- IS IT COMER?

13                   MR. COMER:  YES, YOUR HONOR.

14                   THE COURT:  ALL RIGHT.

15                   MR. COMER:  YOUR HONOR, I WANT TO ADDRESS THE TWO

16      POINTS THAT THE COURT WANTED TO FOCUS COUNSEL'S ATTENTION ON,

17      BUT I WANTED TO JUST BRIEFLY DEAL WITH THIS ISSUE ABOUT

18      WHETHER OR NOT DEFENDANTS HAVE MET THEIR INITIAL BURDEN.

19                    I THINK WE'VE LAID OUT PRETTY CLEAR IN THE MOVING

20      PAPERS THE ISSUE ABOUT PLAINTIFF'S STATUS AS A PUBLIC FIGURE.

21      WE STARTED THIS CASE REALLY WITH A PLAINTIFF COMING TO THE

22      COURT ADMITTING THAT HE IS A WELL-KNOWN ANIMAL RIGHTS

23      ACTIVIST, AND, YOU KNOW, EVEN THE MAJORITY OF WHAT I CAN TELL

24      HIS DAMAGES ARE GOING TO BE SEEMS TO BE LOST SPEAKING

25      ENGAGEMENTS.  I MEAN, THIS IS A PERSON, HAS HIS OWN WEBSITES,
```

```
 1    HAS HIS OWN WIKIPEDIA PAGES.  HE IS AN ACTOR WHO'S APPEARED

 2    IN MULTIPLE MOVIES.

 3              THE COURT:  TWO, RIGHT?

 4              MR. COMER:  YES, TWO MOVIES, CORRECT.

 5              THE COURT:  OKAY.  THAT'S NOT QUITE NECESSARILY

 6    MULTIPLE, BUT...

 7              MR. COMER:  HE'S APPEARED IN TWO MOVIES.  ONE OF

 8    THE MOVIES HE WAS EVEN HELPING TO SHOOT FOOTAGE.  FOR ONE OF

 9    THE MOVIES HE WAS PLAYING A CHARACTER.  HIS CHARACTER WAS

10    PETER.  HE WAS BASICALLY PLAYING HIMSELF.

11              THE COURT:  YOU DON'T SERIOUSLY CONTEND THAT HE'S A

12    PUBLIC FIGURE FOR ALL PURPOSES, DO YOU?

13              MR. COMER:  YOUR HONOR, HE'S NOT JUST AN ORDINARY

14    ANIMAL ACTIVIST.  I MEAN, THIS ISN'T SOMEBODY WHO IS JUST,

15    YOU KNOW, ONE OF THE PEOPLE IN THE MOVEMENT.  HE IS TOUTING

16    HIMSELF AS A WELL-KNOWN ANIMAL ACTIVIST AND I DON'T THINK HE

17    COUNTERED ANY OF THE DECLARATIONS SUBMITTED BY MS. ISRAEL WHO

18    SAID NOT ONLY IS HE A WELL-KNOWN ANIMAL ACTIVIST, HE'S ONE OF

19    THE MOST WELL-KNOWN ANIMAL ACTIVISTS.  THIS IS A PERSON WHO

20    HAS GAINED WIDESPREAD NOTORIETY FOR BEING -- IF NOT THE

21    FIRST, ONE OF THE FIRST INDIVIDUALS TRIED AND CONVICTED UNDER

22    THE ANIMAL ENTERPRISE TERRORISM ACT.  I MEAN, THIS IS

23    SOMEBODY -- I WANT TO SAY HE'S A PIONEER.  BUT, I MEAN, THIS

24    IS SOMEBODY WHO IS KNOWN FOR THIS.  HE SPENT A FEW YEARS IN

25    PRISON AFTER BEING ON THE RUN FOR SEVERAL YEARS.  I MEAN,
```

 1    THIS IS A WELL-KNOWN PERSON.

 2           YOU KNOW, THE LIMITED PUBLIC FIGURE ISSUE -- AND I

 3    DON'T THINK THERE'S EVEN UNDER THE TOP TEST AN ISSUE ABOUT

 4    THE FIRST TWO FACTORS ABOUT THERE BEING A CONTROVERSY AND

 5    MR. YOUNG INJECTING HIMSELF INTO THE CONTROVERSY -- I THINK

 6    WE'RE ALL IN AGREEMENT THAT WE'RE FOCUSED ON THE THIRD PRONG

 7    ABOUT WHETHER OR NOT THIS IS GERMANE TO WHAT HE'S KNOWN FOR.

 8           BUT, I MEAN, I REALLY THINK THAT IT IS GERMANE FOR

 9    WHAT HE'S KNOWN FOR.  TWO REASONS:  ONE, AGAIN, THIS -- IT IS

10    IRONIC THAT YOU HAVE SOMEBODY WHO SAYS THAT ANIMALS SHOULD BE

11    TREATED ON AN EQUAL BASIS AS HUMAN BEINGS, AND AT THE SAME

12    TIME HE DOESN'T TREAT HUMAN BEINGS WITH WHAT HE WOULD -- SAYS

13    HE'S SUPPOSED TO BE TREATING THE ANIMALS LIKE.  I THINK

14    THAT'S VERY IRONIC AND I THINK THE *SIPPLE* CASE, WHO DEALT

15    WITH AN ISSUE OF PUBLIC INTEREST AND DOMESTIC VIOLENCE, THAT

16    WAS ONE OF THE THINGS THAT I THINK THE COURT FOCUSED ON TO

17    SAY, HEY, LOOK, THERE'S THIS IRONY HERE OF SOMEBODY WHO'S

18    RUNNING A POLITICAL CAMPAIGN BASED ON MORAL VALUES WHEN, IF

19    YOU LOOK AT HIS OWN MORAL VALUES, I THINK YOU HAVE QUESTIONS

20    ABOUT.

21           THE COURT:  WHAT DO YOU SAY TO DEFENDANT'S

22    CONTENTION THAT IT'S A MUCH MORE LIMITED FOCUS AND THAT IF HE

23    HAD BEEN WEARING FUR COATS OR EATING ANIMAL FLESH, THAT THAT

24    WOULD BE PERTINENT, BUT NOT HOW HE'S ENGAGING IN CONDUCT WITH

25    REGARD TO PRIVATE RELATIONSHIPS?

```
 1            MR. COMER:  YOUR HONOR, THOSE -- OF COURSE THOSE

 2    ARE EXAMPLES OF WHAT ALSO WOULD BE AN ISSUE -- WOULD BE FREE

 3    TO COMMENT ON, BUT IT'S JUST ONE OF MANY.  I MEAN, THIS IS --

 4    THE ISSUE THAT WE'RE DEALING WITH IS -- I MEAN, HE'S GERMANE

 5    TO BEING A WELL-KNOWN LEADER IN THE ANIMAL RIGHTS ACTIVIST

 6    AND TOUTING ANIMAL RIGHTS VALUES.  AND WHAT'S AT ISSUE IN

 7    THIS CASE IS HOW ONE ANIMAL ACTIVIST IS TREATING ANOTHER

 8    ANIMAL ACTIVISTS, STATEMENTS MADE TO OTHER ANIMAL ACTIVISTS

 9    THAT'S AFFECTING HIS ABILITY TO BE A SPEAKER TO ANIMAL

10    ACTIVISTS EVENTS.  I MEAN, THIS REALLY IS GERMANE TO THIS

11    ISSUE.  I MEAN, THAT'S REALLY ALL IT INVOLVES.  I MEAN, ALL

12    THE PLAYERS IN THIS CASE ARE ANIMAL ACTIVISTS.  AND, I MEAN,

13    THESE STATEMENTS ARE ALLEGED TO HAVE BEEN MADE, ALTHOUGH

14    THERE'S BEEN NO EVIDENCE OF THAT, TO ANIMAL ACTIVIST

15    CONFERENCE ORGANIZERS.

16            SO I THINK THAT -- YOU KNOW, I THINK FUNDAMENTALLY

17    WHAT WE'RE TALKING ABOUT HERE -- AND I KNOW THAT COUNSEL HAS

18    TRIED TO SAY THAT THIS IS OUR OWN INTERPRETATION OF WHAT

19    ANIMAL RIGHTS ACTIVISM IS, BUT I THINK THEY'D HAVE TO

20    ADMIT -- I MEAN, THE ENTIRE PURPOSE, YOU KNOW, OF ANIMAL

21    RIGHTS ACTIVISM IS, YOU KNOW, TREATING ANIMALS AS YOU WOULD

22    TREAT PEOPLE.  I MEAN, IT'S JUST A BETTER TREATMENT OF

23    ANIMALS, AND I THINK THERE'S A DIRECT ISSUE -- A DIRECT -- I

24    MEAN, A DIRECT IRONY WHEN YOU LOOK AT HOW THIS PERSON TREATS

25    OTHER PEOPLE.  I THINK THE ISSUE IS, YOU KNOW, THIS IS A
```

```
1    LEADER IN THE COMMUNITY.  IS THIS THE KIND OF PERSON THAT
2    THEY WANT TO PUT UP ON A PEDESTAL?  I THINK THAT'S A VALID
3    ISSUE TO BE DISCUSSED.
4          THE COURT:  ALL RIGHT.  WHY DON'T YOU ADDRESS THE
5    ACTUAL MALICE ISSUE AND WHY MATT BRUCE AND JORDAN JONES'
6    DECLARATIONS DON'T AT LEAST CREATE A TRIABLE ISSUE AS TO
7    WHETHER OR NOT THERE WAS ACTUAL MALICE.
8          MR. COMER:  YOUR HONOR, I THINK AS THE COURT HAS
9    POINTED OUT, FIRST OF ALL, HE'S -- WE START OFF WITH THESE
10   ARE VERY BIASED DECLARATIONS.  LET'S START WITH THE
11   DECLARATION OF MATT BRUCE.  THIS IS A ROOMMATE OF THE
12   PLAINTIFFS WHO -- IT WAS PART OF MY CLIENT AGREED TO
13   PARTICIPATE BECAUSE, AS THE COURT KNOWS, THERE IS THIS
14   ACCOUNTABILITY PROCESS.  I MEAN, HER GOAL -- SHE FEELS SHE
15   WAS WRONGED BY THIS INDIVIDUAL IN HER RELATIONSHIP.  SHE HAD
16   VERY BAD EXPERIENCES.  SHE HAS TO SEE THIS INDIVIDUAL AT ALL
17   OF THE CONFERENCES SHE GOES TO, ALL OF THE EVENTS SHE GOES
18   TO, AND SHE WANTS TO PUT THIS BEHIND HER.  AND SHE DOESN'T
19   WANT TO GO TO THE POLICE BECAUSE ANIMAL ACTIVISTS THEY DON'T
20   REALLY TRUST AUTHORITY, SO THEY WANT TO HAVE A KIND OF A
21   SOCIAL JUSTICE SYSTEM WHERE THEY CAN KIND OF SIT EVERYBODY
22   DOWN AND SAY, THESE ARE THE ACCUSATIONS AGAINST YOU, LET'S
23   SEE IF WE CAN WORK THIS OUT BECAUSE WE'RE GOING TO BE IN THIS
24   TOGETHER FOR THE NEXT HOWEVER MANY YEARS OF OUR LIVE.
25         SHE AGREED TO PARTICIPATE IN THIS MEDIATION BECAUSE
```

1    SHE THOUGHT THAT, OKAY, MR. YOUNG IS MAKING STEPS HERE.  HE'S

2    AGREEING TO SIT DOWN AND TALK AT LEAST WITH SOMEBODY ELSE

3    ABOUT THE PROBLEMS I HAVE.  SHE APPEARED AT THIS, WHICH WAS

4    SUPPOSED TO BE A FACILITATION, AND THEN IT TURNED OUT BEING

5    THESE TWO GENTLEMEN WHO ARE JUST GANGING UP ON HER AND

6    FORCING HER TO ADMIT THINGS THAT SHE WASN'T COMFORTABLE WITH.

7    AND SHE -- YOU KNOW, SHE SET FORTH IN HER DECLARATION SHE WAS

8    BASICALLY YELLED AT, SHE WAS CRYING THROUGHOUT THE ENTIRE

9    MEDIATION, AND SHE JUST BASICALLY SAID, OKAY, WHATEVER YOU

10   SAY, WHATEVER YOU SAY, I'LL ADMIT IT, I JUST WANT TO LEAVE.

11   OKAY?

12        YOU KNOW, I DON'T SEE HOW THERE COULD BE ANY

13   DAMAGES BECAUSE IF WE TAKE -- EVEN IF WE TAKE THIS

14   DECLARATION AS TO WHAT PLAINTIFF WANTS IT TO BE, THAT SHE

15   MADE ACCUSATIONS AND THEN SHE RETRACTED THEM, I DON'T SEE HOW

16   THERE'S ANY DAMAGES HERE BECAUSE SHE'S -- EVEN IF THIS IS

17   CORRECT, SHE'S RETRACTED EVERYTHING.

18        THE COURT:  WELL, THAT'S TRUE.  IT MAY NOT MEAN

19   THAT THERE ARE ANY DAMAGES FLOWING FROM STATEMENTS SHE MADE

20   TO THESE TWO INDIVIDUALS.  BUT, I GUESS, WHAT THEY'RE TRYING

21   TO PRESENT THE DECLARATIONS FOR IS TO SHOW THAT ANY

22   STATEMENTS THAT SHE OTHERWISE MADE TO OTHERS THAT WERE

23   REPUBLISHED, THAT THERE IS EVIDENCE FROM THESE TWO

24   DECLARATIONS THAT SHE EITHER EXAGGERATED OR DID NOT TELL THE

25   TRUTH.

```
 1              MR. COMER:  YES, I SEE THE ARGUMENT AND I JUST --
 2   YOU KNOW, THE KEY, I THINK -- I WANTED TO ADDRESS JUST
 3   BRIEFLY BEFORE I FORGET THE JORDAN JONES DECLARATION.  YOUR
 4   HONOR, WE WOULD BE PREJUDICED IF THE COURT WOULD ACCEPT THAT
 5   JORDAN JONES DECLARATION BECAUSE WE NEVER SAW IT UNTIL JUST A
 6   FEW DAYS BEFORE THIS HEARING AND WE DIDN'T GET A CHANCE TO
 7   REBUT THE CONTENTS OF THAT IN OUR REPLY.
 8              THE COURT:  DO YOU WISH TO HAVE A CHANCE TO DO SO?
 9              MR. COMER:  YOUR HONOR, IF THE COURT IS GOING TO BE
10   CONSIDERING THE JORDAN JONES DECLARATION.
11              THE COURT:  RIGHT.
12              AND I'VE ALREADY INSTRUCTED THEM TO PROVIDE
13   PROPERLY AFFIRMED DECLARATIONS BY CLOSE OF BUSINESS TOMORROW,
14   SO YOU CAN HAVE UNTIL FRIDAY TO SUBMIT A RESPONSE OF NO MORE
15   THAN THREE PAGES.
16              MR. COMER:  THANK YOU, YOUR HONOR.
17              YOUR HONOR, TO GET BACK TO WHAT THE COURT'S POINT
18   WAS, THE PROBLEM, AS WE SEE IT, IS, YOU KNOW, THE STATEMENTS
19   THAT ARE ALLEGED TO HAVE BEEN MADE IN THE JONES SITUATION,
20   THE BRUCE SITUATION AREN'T REALLY THE STATEMENTS THAT WE SEE
21   IN THE E-MAILS AND EVERYTHING ELSE.
22              OKAY.  THERE'S -- WE START WITH THE COMPLAINT,
23   WHICH SAYS, YOU KNOW, THERE'S GOING TO BE ACCUSATIONS MADE
24   THAT HE IS A RAPIST, HE IS A PREDATOR, HE DID X, HE DID Y.
25   WHEN WE ACTUALLY SEE THE WRITTEN STATEMENTS, IT IS THERE ARE
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT

1    MULTIPLE ACCUSATIONS AGAINST THIS PERSON THAT WAS IN THE

2    REGAN DECLARATION.  AND THERE'S JUST NO STATEMENTS OUT THERE

3    THAT SUPPORT WHAT PLAINTIFF HAS SAID, THAT SOMEONE HAS CALLED

4    HIM A RAPIST, THAT SAID HE HAS RAPED MULTIPLE WOMEN, THAT

5    SAID HE IS A PREDATOR, THAT SAID HE IS DANGEROUS.

6         WHEN WE ACTUALLY LOOK AND PARSE OUT THE ACTUAL

7    STATEMENTS THAT WERE MADE, I DO THINK THAT MAJORITY OF THESE

8    ARE OPINION.  PLAINTIFF SAID THAT IT WAS LUDICROUS THAT

9    ACCUSATIONS SUCH AS SOMEONE WAS STARVED OR SOMEONE ALMOST

10   DIED, YOU KNOW, THAT THESE ARE SOMEHOW CAPABLE OF BEING

11   PROVED, THIS IS EXACTLY WHAT HYPERBOLE IS.  THIS IS HOW

12   PEOPLE TALK.  YOU KNOW, OH, I -- YOU KNOW, HE STARVED ME AND

13   I DIDN'T HAVE ENOUGH TO EAT, I ALMOST DIED.  I DON'T THINK

14   THAT THAT'S SOMETHING THAT, YOU KNOW, SOMEONE WOULD SAY --

15   TAKE THAT AT FACE VALUE, OH, THIS PERSON ALMOST PASSED AWAY.

16   I THINK THAT THESE ARE OPINIONS.

17        AND, IN FACT, IF WE LOOK AT THE EXACT STATEMENTS

18   THAT WERE MADE, THERE'S ONLY A FEW OF THEM, AND ONE OF THEM

19   WAS IN THE E-MAIL POSTED TO THE GAYLEN GROUP.  AND IN THAT

20   STATEMENT THAT THE ALLEGATIONS WERE -- I THINK IT WAS THREE

21   ALLEGATIONS.  ONE WAS THAT SHE PUT HER LEGAL HEALTH AND

22   SAFETY AT RISK.  TWO WAS EMOTIONAL ABUSE.  THERE'S BEEN A LOT

23   MADE ABOUT THIS EMOTIONAL ABUSE AND I JUST -- AGAIN, I THINK

24   THAT'S AN OPINION.  YOU KNOW, HOW -- WHAT THE STATEMENTS THAT

25   MR. YOUNG MADE TO MS. ISRAEL, SHE SEES THOSE AS EMOTIONAL

1   ABUSE.  HE MAY JUST SEE THEM AS, YOU KNOW, THAT'S HOW GUYS

2   ACT.  BUT, YOU KNOW, TO MY CLIENT, YOU KNOW, THE STATEMENTS

3   THAT ARE MADE, THIS IS EMOTIONAL ABUSE.  AND, YOU KNOW, I

4   DON'T THINK HE REFUTED THAT IN HIS DECLARATION.  HE BASICALLY

5   JUST SAID I'VE NEVER EMOTIONALLY ABUSED A WOMAN, BUT HE NEVER

6   SAID I DIDN'T MAKE THESE STATEMENTS TO HER.

7           AND THE THIRD ONE WAS, YOU KNOW, HE THREATENED TO

8   ABANDON ME.  THEY'VE ALREADY ADMITTED -- MR. YOUNG HAS

9   ALREADY ADMITTED THAT IN HIS DECLARATION HE SUGGESTED THAT

10  MAYBE HE COULD LEAVE MS. ISRAEL AT AN AIRPORT OR A BUS

11  STATION.

12          OKAY.  AGAIN, I THINK WHETHER OR NOT THIS IS A

13  THREAT OF ABANDONMENT, THIS IS SOMEBODY'S OPINION.  OKAY?

14  THIS ISN'T SOMETHING THAT CAN BE LEGALLY VERIFIED, YOU KNOW,

15  SUGGESTING TO LEAVE THIS YOUNG WOMAN AT A BUS STOP, YOU KNOW,

16  IS THIS A LEGALLY PROVABLE FACT.

17          THE COURT:  WELL, ONE OF THE INFERENCES THAT I

18  PRESUMED THE PLAINTIFF WANTS THE COURT TO DRAW FROM THE JONES

19  AND BRUCE DECLARATIONS IS THAT THE DEFENDANT ACTUALLY

20  FABRICATED SOME OF THESE ACCUSATIONS BECAUSE SHE EITHER WAS

21  STILL IN LOVE WITH THE PLAINTIFF OR WANTED TO HAVE A VENDETTA

22  AGAINST THE PLAINTIFF FOR HAVING ENDED THE RELATIONSHIP.

23          IF THAT IS THE THEORY OF THE CASE, HOW WOULD THAT

24  FIT IN WITHIN THE PUBLIC DISCOURSE THEORY?

25          MR. COMER:  WELL, FIRST, YOUR HONOR, YOU KNOW, I

1    KNOW THEY'RE TRYING TO DRAW THESE INFERENCES AGAIN FOR

2    PURPOSES OF THIS CASE, YOU KNOW, WE NEED DIRECT EVIDENCE, A

3    CLEAR AND CONVINCING EVIDENCE OF MALICE, NOT INFERENCE.

4         BUT, YOU KNOW, AS FAR AS THIS, YOU KNOW, PUBLIC

5    DISCOURSE ISSUE, YOU KNOW, SHE WANTS TO TELL PEOPLE WHAT

6    HAPPENED TO HER.  OKAY?  THIS IS A YOUNG WOMAN, AGAIN, WHO

7    EXPERIENCED SOME BAD THINGS.  SHE WANTS TO TELL HER FRIENDS,

8    YOU KNOW, LOOK, THIS HAPPENED TO ME.  I WANT TO GET PAST IT.

9    YOU KNOW, SHE THINKS THIS IS A DANGEROUS PERSON.  THIS IS

10   SOMEBODY WHO IN HIS SEVERAL SPEAKING ENGAGES AT COLLEGES AND

11   FORUMS ACROSS THE COUNTRY INTERACTS WITH MANY YOUNG WOMEN.

12   AND, YOU KNOW, IF EVERYONE JUST, YOU KNOW, WAS QUIET ABOUT

13   THEIR RELATIONSHIPS AND WHAT HAPPENS TO IT, YOU KNOW, SHE'S

14   WORRIED THAT THIS IS GOING TO HAPPEN AGAIN TO OTHER WOMEN.

15   AND SHE THINKS IF SHE SPEAKS OUT, YOU KNOW, IF THERE'S SOME

16   DISCUSSION ABOUT THIS ONE, SHE'S HOPING HE'LL PARTICIPATE IN

17   THIS ACCOUNTABILITY PROCESS AND HE CAN GET HELP.  AND TWO,

18   YOU KNOW, SHE THINKS THAT DISCUSSING THIS, AT LEAST, YOU

19   KNOW, OTHER PEOPLE WILL, YOU KNOW, MAYBE THINK TWICE.

20        AND, AS FAR AS, YOU KNOW -- I THINK THIS CASE IS

21   VERY, VERY DIFFERENT AGAINST MS. LUNGARELLI AND MS. ISRAEL.

22        OKAY.  I DON'T -- THE CASE THAT THE COUNSEL CITED

23   ABOUT REPEATING A DEFAMATORY STATEMENT, I AGREE WITH THAT,

24   YOUR HONOR.  IT -- YOU KNOW, IT DOES NOT EXCUSE IF SOMEBODY

25   REPEATS A DEFAMATORY STATEMENT.  I AGREE THAT THAT PERSON

1    WOULD STILL BE LIABLE IF THE UNDERLYING STATEMENT WAS FALSE.

2    I DON'T DENY THAT.

3         THE QUESTION IS REALLY IF WE FOCUS ON WHAT

4    LUNGARELLI SAID, THERE WAS ONLY THREE INSTANCES WHERE SHE

5    EVEN MENTIONED IN THE OPPOSITION.  OKAY?

6         TWO, WERE THESE E-MAILS ON A LISTSERV TO HER

7    FRIENDS, TO MS. ISRAEL AND MR. ADAM WEISSMAN.  OKAY?  AND

8    NONE OF THEM MADE ANY DEFAMATORY STATEMENTS.

9         WELL, THE ONLY ONE THAT EVEN CAME CLOSE WAS ONE

10   WHERE LUNGARELLI SAYS TO EVERYBODY SOMEBODY ELSE HEARD THAT

11   MR. YOUNG WAS A RAPIST AND THEY WANT TO KNOW WHAT WE SHOULD

12   DO ABOUT SHOWING HIS MOVIE.  EXCUSE ME.  WHAT THEY SHOULD DO

13   ABOUT SHOWING HIS MOVIE.  SHE'S NOT CALLING HIM A RAPIST OR A

14   PREDATOR OR SAYING ANYTHING.  SHE'S JUST SAYING TO HER

15   FRIENDS, HEY, SOMEBODY ELSE TOLD ME THIS, HOW SHOULD WE

16   RESPOND.  THAT WAS ONE.

17        THE SECOND ONE --

18        THE COURT:  IS THERE ANY EVIDENCE AS TO HOW THAT

19   GOT ONTO A WEBSITE?

20        MR. COMER:  NO, YOUR HONOR.

21        ALL OF THOSE E-MAILS, BOTH FROM MS. ISRAEL AND MS.

22   LUNGARELLI WERE SENT TO MR. ADAM WEISSMAN AND WHOEVER THE --

23   YOU KNOW, LUNGARELLI'S WERE ALSO SENT TO ISRAEL, ISRAEL'S

24   WERE ALSO SENT TO LUNGARELLI.  MY CLIENTS HAVE STATED UNDER

25   OATH THAT THEY DID NOT PUBLISH THOSE TO THE INTERNET.  I

```
 1   CANNOT SPEAK FOR WHAT MR. WEISSMAN DID WITH THOSE E-MAILS
 2   HERE TODAY.  ALL WE KNOW IS THAT THESE WERE PRIVATE
 3   CONVERSATIONS ON A LIST SERVE.  WE DON'T KNOW HOW THEY WERE
 4   PUBLICIZED.  I DON'T THINK THE PLAINTIFF HAS MET THE BURDEN
 5   TO SHOW WE DID THAT.  I MEAN, THERE'S A LOT OF THESE EXAMPLES
 6   HERE WHERE, YOU KNOW, THEY SAY, HEY, LOOK, THERE'S A
 7   WIKIPEDIA PAGE, BUT THERE'S NO CONNECTION TO MY CLIENTS.
 8           THE FLYER -- AND THEY HAVE ADMITTED MR. WEISSMAN
 9   WAS THE ONE THAT DISTRIBUTED THIS FLYER.  THERE'S A LOT OF
10   INSTANCES WHERE THEY JUST DON'T CONNECT.
11           GETTING BACK TO MS. LUNGARELLI, SO THAT WAS THE
12   FIRST E-MAIL.  THE SECOND ONE WAS -- AND YOU CAN EVEN SEE
13   THIS FROM THE FACE THESE E-MAILS, MR. WEISSMAN RECEIVED A
14   MESSAGE FROM A THIRD-PARTY WOMAN AND MRS. LUNGARELLI WROTE A
15   POTENTIAL RESPONSE TO THAT AND SHE SENT IT BACK TO
16   MR. WEISSMAN SAYING HERE'S A POTENTIAL RESPONSE YOU CAN SEND
17   TO THIS PERSON, YOU CAN SEND IT, YOU CAN THROW IT AWAY, I
18   REALLY DON'T CARE WHAT YOU DO WITH IT.  AND, AGAIN, IF YOU
19   READ IT, THERE'S NO STATEMENTS IN THERE WHERE SHE SAYS, LOOK,
20   HE'S A RAPIST, HE'S A PREDATOR, ANYTHING LIKE THAT.
21           AND FINALLY, THE THIRD STATEMENT IS THIS DOUBLE
22   HEARSAY STATEMENT WHERE ALLEGEDLY THE PLAINTIFF HEARD FROM
23   MR. WEISSMAN WHO HEARD FROM MS. LUNGARELLI THAT SHE KNEW OF
24   INDIVIDUALS THAT HE HAD RAPED.  MY CLIENT, MS. LUNGARELLI,
25   HAS CLARIFIED WHAT SHE HAS TOLD TO MR. WEISSMAN, WHICH WAS I
```

1    HAVE HEARD ACCUSATIONS FROM OTHER WOMEN OF THINGS THAT THEY

2    CONSIDERED SEXUAL ASSAULT.  AND SO ON ONE LEVEL I DON'T THINK

3    THERE'S ANY ACTIONABLE DEFAMATORY STATEMENTS.  AND TWO, THERE

4    IS ZERO EVIDENCE OF ANY MALICE ON BEHALF OF MRS. LUNGARELLI.

5            THE COURT:  ALL RIGHT.  THANK YOU.

6            THE MATTER WILL STAND SUBMITTED.  YOU DO HAVE YOUR

7    SCHEDULING CONFERENCE SET FOR TODAY, SO I'M GOING TO GO AHEAD

8    AND GIVE YOU YOUR DATES.  THE DATES FOR TRIAL AND FINAL

9    PRETRIAL CONFERENCE THAT THE PARTIES BOTH JOINTLY REQUESTED

10   WILL BE APRIL 10, 2012 AT 8:30 A.M. FOR JURY TRIAL; FINAL

11   PRETRIAL CONFERENCE DATE WILL BE MARCH 13, 2012 AT 2:00 P.M.;

12   DEADLINE FOR AMENDED PLEADINGS AND ADDITION OF PARTIES IS

13   SEPTEMBER 19, 2011, THAT INCLUDES THE HEARING OF ANY MOTION

14   TO AMEND PLEADINGS; THE NONEXPERT DISCOVERY CUTOFF WHICH

15   INCLUDES THE HEARING OF ANY DISCOVERY MOTIONS IS DECEMBER 6,

16   2011; MOTION CUTOFF FILING DEADLINE IS DECEMBER 13, 2011; THE

17   INITIAL EXPERT DISCLOSURE AND REPORT DEADLINE IS JANUARY 10,

18   2012; REBUTTAL EXPERT DISCLOSURE AND REPORT DEADLINE IS

19   FEBRUARY 7, 2012; EXPERT DISCOVERY CUTOFF IS FEBRUARY 21,

20   2012; SETTLEMENT CONFERENCE COMPLETION DATE IS FEBRUARY 14,

21   2012.  AND I'M GOING TO SET A DEADLINE FOR EARLY MEDIATION IN

22   THIS CASE, SEPTEMBER 2, 2011 WITH A JOINT REPORT REGARDING

23   RESULTS OF EARLY MEDIATION DUE ON SEPTEMBER 9, 2011.

24            ALL RIGHT.  ANYTHING FURTHER?

25            MS. RYTHER:  REGARDING THE CMC, NO, YOUR HONOR.

```
 1              THE COURT:  ALL RIGHT.  THESE DATES WILL BE
 2    INCORPORATED IN A SCHEDULING CONFERENCE AND CASE MANAGEMENT
 3    ORDER WITH SOME ADDITIONAL DATES RELATING TO DOCUMENTS THAT
 4    HAVE TO BE FILED PRIOR TO PRETRIAL CONFERENCE, ALTHOUGH I
 5    THINK THAT THIS CASE PROBABLY SHOULD AND CAN BE RESOLVED
 6    BEFORE ANY TRIAL ON THE MATTER.  REGARDLESS OF HOW THE COURT
 7    RULES ON THIS PARTICULAR PENDING MOTION, THERE ARE STILL
 8    OTHER ISSUES, APPARENTLY THERE'S A COUNTERCLAIM AND ALSO AT
 9    LEAST ONE OF THE DEFENDANTS HAS NOT YET BEEN SERVED.
10              DOES -- DO THE -- DOES THE PLAINTIFF INTEND TO
11    SERVE THE REMAINING DEFENDANT?
12              MS. RYTHER:  YES, YOUR HONOR.
13              I WAS PLANNING ON BRINGING A MOTION TO SERVE VIA
14    PUBLICATION VERY SHORTLY BECAUSE WE HAVE TRIED AND TRIED AND
15    HAD A LOT OF FAILED ATTEMPTS.
16              THE COURT:  ALL RIGHT.  ALL RIGHT.
17              ANYTHING FURTHER FROM EITHER SIDE?
18              MS. RYTHER:  NO, YOUR HONOR, NOTHING FROM
19    PLAINTIFFS.
20              MR. COMER:  NO, YOUR HONOR.
21              THE COURT:  ALL RIGHT.  THANK YOU.
22              MR. COMER:  THANK YOU, YOUR HONOR.
23                   (END OF PROCEEDINGS.)
24                        --000--
25
```

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT**

```
 1                    CERTIFICATE OF REPORTER

 2

     COUNTY OF LOS ANGELES     )
 3                             )  SS.
     STATE OF CALIFORNIA       )

 4

 5

 6   I, ROSALYN ADAMS, OFFICIAL COURT REPORTER, IN AND FOR THE

 7   UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

 8   CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

 9   TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

10   CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

11   PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

12   TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

13   OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15

16   DATED:  DECEMBER 26, 2011

17

18        /S/  ROSALYN ADAMS

19   ROSALYN ADAMS, CSR 11794
     OFFICIAL COURT REPORTER
20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT**